699 So.2d 434 (1997)
Jack OWENS, Jr. and Anne Reeves Faillace, PlaintiffsAppellees,
v.
CONCORDIA ELECTRIC COOPERATIVE, INC., and the Catahoula Parish Police Jury, DefendantsAppellants.
No. 95-1255.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1997.
Rehearing Denied September 25, 1997.
*436 Anne Elizabeth Watson, Sunset, Gill Smith, for Jack F. Owens Jr.
Albin Alexandre Provosty, Alexandria, Gregory Lynn Jones, Shreveport, for Concordia Electric Cooperative, Inc., et al.
Julie Mobley Lafargue, Shreveport, for Catahoula Parish Police Jury.
Before DOUCET, C.J., and YELVERTON, THIBODEAUX, SAUNDERS and WOODARD, JJ.
THIBODEAUX, Judge.
This is an appeal of a bifurcated wrongful death action. The trial court awarded $1,000,000.00 each in wrongful death damages to Jack Owens, Jr. and Anne Reeves Faillace and $6,645.37 in special damages to Jack Owens, Jr. and against Concordia Electric Cooperative and the Catahoula Parish Police Jury for the death of their son, Jack Forsyth Owens, III (hereinafter referred to as "T-Jack") on September 15, 1990. The plaintiffs and both defendants appeal the questions of liability and damages.
Because we find legal error in the manner in which the trial judge polled the jury post-verdict and in modifying the damage figure in the jury verdict form, we conduct a de novo review of this case. We amend the judgment of the trial court to award $350,000.00 in wrongful death damages to each plaintiff, Jack Owens, Jr. and Anne Reeves Faillace, and $6,645.37 in special damages to Jack Owens, Jr. Fault is assessed at 65% to T-Jack, 25% to Concordia Electric, and 10% to Catahoula Parish.

I.

DE NOVO REVIEW
Following thirteen (13) days of trial involving eighty (80) witnesses and seventy-nine (79) exhibits, the jury returned its special verdict. It found both T-Jack and Concordia negligently liable for the decedent's death. Jurors apportioned fault in the following manner:
  T-Jack 75%
  Concordia 25%
  Catahoula 0%
Based upon its finding that T-Jack did not endure any conscious pain and suffering before dying, the jury denied plaintiffs' demand for survival damages; however, jurors granted each plaintiff $250,000.00 in wrongful death damages,[1] and also granted Jack Owens, Jr. $6,645.37 in special damages to cover *437 T-Jack's property loss and funeral expenses. After polling the jury, the trial judge sent each juror back into the deliberation room and asked counsel to approach the bench. Within the lengthy bench conference that ensued, the court explained:
Judge:
I have a question and you'll see why. How much money does that mean? Does that mean two hundred and fifty thousand ($250,000.00), or twenty-five percent (25%) of $250,000.00?
Mr. Provosty:
That means 25%.
Judge:
All right. That'sthat's the way I interpreted it. However, let me tell you why I got y'all up here. Mr. Bobby, would you come here please? All the jurors are out aren't they?
Bailiff:
Yes, sir.
Judge:
All right. We're onare we on the record?
Deputy Clerk:
Yes, sir.
Judge:
Okay. I want to make sure we do this right. Mr. Bobby's beenyou know, they've been asking for exhibits and things and as the Bailiff he's properly been handling that. The last question that he asked mewould you tell them the last question you asked me?
Bailiff:
They wanted to know on the 25% that awarded [sic], theywould it be split down the middle, $250,000.00 each. They werethat's what they wanted.
Judge:
But what was the first question you asked me about a figure?
Bailiff:
Oh. Ififin other words, they said the death, wanted [sic] a figure of two million dollars ($2,000,000.00) and they wanted to base it 25% of that split between the two of themthe 25% split between the two of them on two hundredtwo million dollars ($2,000,000.00).
Judge:
Well, if it'sif it's $2,000,000.00, they get $250,000.00 each. That was the intent of the Jury.
* * * * * *
Ms. Watson [plaintiff's attorney]:
We need to talksomebody needs to talk to them.
* * * * * *
Mr. Provosty:
They're [bailiffs] not supposed to be listening to what they're [jury] saying out there anyway.
* * * * * *
Judge:
The way they do it is they send him [bailiff] the question, I give an answer and he [bailiff] goes back
Bailiff:
... (inaudible) ... asked me to ask the judge if that was what they were supposed to do.
Judge:
The answer that I gave to him [bailiff] was, if they have made up their minds, that they are finding two million total
Mr. Provosty:
It says right here, that the Court is going to reduce it, not the Jury.
* * * * * *
Judge:
Alright. See, that's why I hadn'tI'm letting him [bailiff] answer cause I don't want to suggest the answers. What did I tell you, Mr. Bobby?
Mr. Provosty:
It says it in the instructions.
Bailiff:
That you saidyou told me that I asked you about the twenty-five ... (inaudible) ... the twenty-five percent (25%) would be split between the two parties. He told that it would be, but they needed to put two hundred and fifty thousand dollars ($250,000.00) *438 where Jackie's name was and two fifty for her underunder the twenty-five percent (25%).
Mr. Watson:
What about the two million ($2,000,000) though?
Bailiff:
They [jury] said they based their figures on two million (2,000,000).
Ms. Watson:
... (inaudible) ... somebody needs to talk to them [jury].
Bailiff:
Twenty-five percent (25%) on two million dollars ($2,000,000.00).
Judge:
See? That's what he camehe's [bailiff] told me there's two million (2,000,000) andthere's a little getting lost in the interpretation here. But the
* * * * * *
Mr. Provosty:
They [jury] were told that thethe Court will reduce it. It's right in the instructions.
Judge:
Yeah, I know it. But they didn't understand that or they wouldn't have sent him [bailiff] with a question.
* * * * * *
Judge:
They didn't know if they had reached a verdict or not. He came and said, "I think they've reached a verdict. They want to give them total two million (2,000,000)." And I said, "Two million (2,000,000)?" And he said, "But they only want them to get twenty-five percent (25%) of that because they found T. Jack seventy-five percent (75%) at fault."
* * * * * *
Ms. Watson:
I think you couldyou and the bailiff should go in there and speak to them?
Judge:
I don't know.
Mr. Provosty:
I don't think the bailiff has a right to speak for anybody.
* * * * * *
Ms. Watson:
Ask them if they reduced it, and if they did reduce it what was the amount before they reduced it. That's what you need to do.
* * * * * *
Mr. Provosty:
II'm going toI'm going to object, and say that the Jury has deliberated and put it on the record. And then if you go in and do it, that's fine.
Judge:
Alright. Look though, I think that either I confused Mr. Bobby or the Jury was confused one.
* * * * * *
In response to plaintiffs' counsel's entreaty, the court recalled the jury foreperson and polled him as follows:
Judge:
Have a seat right here. Can you tell us what the total amount of the award that was arrived at by the jury before it waswell, what was the total award first arrived at by the jury?
Foreperson (Stephen Davis):
The first amount? Not what we took the 25% of?
Ms. Watson (plaintiffs' attorney):
Yeah. The amount.
Foreperson:
The first amount was a million dollars ($1,000,000.00).
Judge:
All right. To whom?
Foreperson:
To split between the both of them. You know, they was going to take 25% of $1,000,000.00. Then they decided that wasn't enough and they went to $2,000,000.00 and said 25% of $2,000,000.00.
Judge:
So, what was the intention of the jury to award the plaintiffs in this case?

*439 Foreperson:
Five-hundred thousand dollars ($500,000.00) as a total.
Judge:
And howstart at the top and tell us how you arrived at that.
Foreperson:
Well, theythey said that thethey was setting it between $1,000,000.00 and $2,000,000.00. And they decided that to go with 25% of $2,000,000.00. I don't know how they come up with that.
Judge:
All right. So, 25% of $2,000,000.00, whatthewhat about the seventy-five percent (75%) fault? In other words, if there hadn't been any fault, they would have awarded $2,000,000.00?
Foreperson:
Right. That's exactly right. That's how they come up with thethat's how they got the amount. They deducted 75% of that [$2,000,000.00].
The court then polled individually the remaining eleven jurors, all of whom stated that each plaintiff should receive wrongful death damages in the amount of $1,000,000.00 before T-Jack's comparative fault was deducted therefrom. Concordia objected to the court's questioning as improper reformation of the jury's verdict. Concordia moved in open court for a mistrial. The motion was denied.
Upon the jury's 0% fault apportionment to Catahoula, the following colloquy transpired:
Catahoula Atty (Ms. Lafargue):
I think, Judge, youyou either need to concur in thein the verdict that the jury rendered inin favor of my client, the Police Jury, or render your own verdict.
Judge:
All right. I can either do that now or in writing. I basically concur with it. I concur with them.
Catahoula Atty:
I'll submit a judgment. I'll circulate it to counsel and then submit it to you for signature.
Judge:
All right.
On February 25, 1994, Concordia moved for final judgment to be rendered upon the jury's special verdict. Within the proposed judgment attached to its motion, Concordia manifested its understanding that the jury's verdict entitled Anne Reeves Faillace to recover $62,500.00 (i.e. 1/4 of $250,000.00) plus legal interest and, likewise, such verdict entitled Jack Owens, Jr. to receive $64,161.35 (i.e. 1/4 of $256,645.37) plus legal interest. On March 3, 1994, plaintiffs responded to Concordia's proposed judgment by moving that the trial court, under La.Code Civ.P. art. 1951(2), amend the jury's special verdict to reflect the court's post-poll findings, and render final judgment thereupon as amended.
The trial judge rejected plaintiffs' claims against Catahoula, and confirmed the jury's finding of no fault. On May 4, 1994, plaintiffs responded by moving for a new trial as well as for a judgment non obstante veredicto (JNOV). The trial court granted plaintiffs' new trial motion.
On March 3, 1995, the district court rendered a final judgment and, pursuant to La. R.S. 13:5105, fixed Catahoula's fault apportionment at ten percent (10%) and discretionarily reduced T-Jack's comparative negligence apportionment by 10% to 65%. The court did not adjust Concordia's 25% fault apportionment. Citing its La.Code Civ.P. art. 1814 additur authority, the trial court then granted each plaintiff $1,000,000.00 in general damages before any comparative fault reduction. Accordingly, the court rendered favorable judgment to Anne Reeves Faillace by ordering Concordia to pay her $250,000.00 (i.e. 1/4 of $1,000,000.00) and Catahoula to pay her $100,000.00 (i.e. 10% of $1,000,000.00). Likewise, the court rendered favorable judgment to Jack Owens, Jr. by ordering Concordia to pay him $250,000.00 and Catahoula to pay him $100,000.00.
Concerning the jury's $6,645.37 special damages award granted to Jack Owens, Jr., the trial court reasoned that both defendants were collectively bound to pay only 35% (i.e. Concordia's 25% + Catahoula's 10%) of $6,645.37, or $2,325.88. The court then *440 reapportioned liability for payment of these special damages in a 60:40 ratio against Concordia and Catahoula, respectively. Accordingly, the court ordered Concordia to pay Jack Owens, Jr. an additional $1,395.53 (i.e. 60% of $2,325.88) and, likewise, ordered Catahoula to pay Jack Owens, Jr. an additional $930.35 (i.e. 40% of $2,325.88) as medical/funeral expense reimbursement. All tolled, Jack Owens, Jr. was due to receive $251,395.53 from Concordia plus legal interest from the date of judicial demand until paid, and $100,930.35 from Catahoula plus legal interest from the date of judicial demand until paid. Finally, the court dismissed Concordia's cross claim against Catahoula, and apportioned costs in a 60:40 ratio against Concordia and Catahoula, respectively. All parties appeal from the trial court's disposition.

II.

A. POST-POLL JUDGMENT MODIFICATION
Following closing arguments, the trial court explicitly instructed jurors not to deduct T-Jack's comparative fault apportionment from any wrongful damages award:
The dollar amount in damages, if any, awarded to plaintiffs, Jack Owens and Anne Faillace, will be reduced by the court, by the percentage of any negligence you assign to T-Jack Owens. Such a finding will not prevent his parents from recovery, but will reduce their recovery by that percentage. You do not need to make this calculation, as the court will make this calculation for you (emphasis ours).
The special verdict form indicated jurors' apparent intent to grant each plaintiff wrongful death damages totaling $250,00.00 less T-Jack's comparative fault apportionment; however, because of several questions jurors posed to the court through its bailiff, the trial judge informed counsel that jurors may have deviated from the court's instruction not to deduct T-Jack's comparative fault from its damages award. In response to plaintiffs' request, the court polled each juror by asking whether the $250,000.00 figure reflected the sum plaintiffs were to receive prior to or after the court reduced the award by T-Jack's comparative fault apportionment. Despite a plain reading of the special verdict form, the jurors evinced their intent to grant plaintiffs $2,000,000.00 ($1 million apiece) before T-Jack's comparative fault reduction; therefore, in contravention of the trial court's instructions, the $250,000.00 sum reflected a post-reduction award. In this manner, an inconsistency arose between the verdict form and the trial court's "polling" results.
Jury polling is the post-verdict process whereby the trial court asks each juror whether the verdict is hers/his. Polling's primary purpose is to determine whether all jurors voted, and whether a legally sufficient number voted in favor of a particular verdict. As a general rule, civil litigants have no codal or statutory authority to poll jurors (contrast with the criminal litigant's right to poll jurors under La.Code Crim.P. art. 812); however, the civil litigants' right to poll jurors has been preserved jurisprudentially. Acosta v. Pendleton Memorial Methodist Hosp., 545 So.2d 1053 (La.App. 4 Cir.), writs denied, 551 So.2d 637 & 638 (La.1989).
The trial judge clearly violated La. Code Civ.P. art. 1796 which states:
A. If a jury, after retiring for deliberation, desires to receive information on any point of law, they shall be conducted to the courtroom.
B. After giving notice to the parties, the court may give the appropriate instructions.
C. The court, after giving notice to the parties, may recall the jury after they have retired:
(1) To correct or withdraw an erroneous instruction.
(2) To clarify an ambiguous instruction.
(3) To inform the jury on a point of law which should have been covered in the original instructions.
(4) To give such further instructions as may be appropriate.
(emphasis ours).
When the jury had a query concerning the verdict form, the judge should have notified the attorneys and given the attorneys an *441 opportunity to object to any proposed instruction. More importantly, the judge should have recalled the jury to the courtroom to hear his response. The judge, not the bailiff, should have delivered the requested instructions, on the record, directly to the jury. La.Code Civ.P. art. 1796.
The bailiff's attempt to instruct the jury violated principles derived from case law as well as statutory law. Any communication between the bailiff and the retired jury about the matter pending before the jury is deemed presumptively prejudicial. State v. Marchand, 362 So.2d 1090 (La.1978); State v. Duplissey, 550 So.2d 590 (La.1989). In Duplissey, the supreme court observed that "[a] frequent source of extraneous information or influence is a communication between a court official and a juror." Id. at 593. It considered a bailiff's comments to the jury concerning the mechanics of deliberating on a verdict and held that such unauthorized communications are deemed prejudicial and "likely to undermine the integrity of the deliberation process." Id. at 595. In State v. Bibb, 626 So.2d 913, 922 (La.App. 5 Cir. 1993), the court summarized and explained these principles:
Initially in any trial, there is a presumption of jury impartiality. However, any unauthorized communication, contact, or tampering directly or indirectly, made by a non-juror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties (citations omitted). (emphasis added).
Duplissey and Bibb were criminal cases. However, the rules embodied in La.Code Civ.P. art. 1796 are based on La.Code Crim.P. art. 808, as the comments to Article 1796 indicate.
In this case, the bailiff was placed in the active role of delivering supplemental verbal jury instructions. It is impossible to ascertain what instructions the bailiff actually delivered or if those instructions were correct. From the record, we must assume that he served only to confuse the jury. We cannot countenance such actions that threaten "the integrity of the deliberation process."
The "polling" of the jury by the trial judge exceeded the boundaries of propriety. No further inquiry should have been made after it was revealed that an adequate number of jurors, ten out of twelve, had agreed with the verdict. Since the issue of whether an external influence was improperly brought to bear upon a juror is not present here, no further "polling" should have taken place. La.Code Evid. art. 606(B). It was this "polling" which revealed the jurors' misunderstanding of the court's instructions. The trial judge thus improperly invaded the province of the jury. "[I]nvasive scrutiny of a juror's individual deliberation or investigation of a jury's collective reasoning for reaching a verdict are disfavored in the law as a matter of public policy. The reason for this rule is to promote the jury's discovery of the truth by preventing litigants from invading the province of the jury room." Uriegas v. Gainsco, 94-1400 (La.App. 3 Cir. 9/13/95); 663 So.2d 162, 170-171, writ denied, (La.12/15/95); 664 So.2d 458.
The impropriety of the trial court's conduct was exacerbated when it rejected a proposed judgment submitted by Concordia and instead signed a reformed judgment reflecting the court's post-poll findings. This judgment was later amended to correct a clerical error to award each plaintiff $1,000,000.00 instead of $2,000,000.00. After granting the plaintiffs' motion for a new trial, the trial court adjusted the comparative fault apportionment for each party as previously explained in this opinion on its own motion. This was a violation of La.Code Civ.P. art. 1951 because this action went beyond a mere alteration of the phraseology of the judgment or a correction of calculation errors.
The errors described above are reversible errors of law. We are required, therefore, to conduct a de novo review of the facts from the entire record and render a judgment on the merits. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95); 650 So.2d 742.

*442 III.

APPEAL & ERROR
In their appeal, plaintiffs assert that:
1) the jury erred by assigning only 25% fault to Concordia; and,
2) the trial court erred
a. in admitting into evidence the results of T-Jack's BAC test; and,
b. by assigning only 10% fault to Catahoula.
Each defendant appeals suspensively. In its appeal, Concordia urges that:
1) the jury erred in
a. finding T-Jack only 75% at fault;
b. finding Concordia 25% liable;
c. awarding each plaintiff $1 million in wrongful death damages; and,
2) the trial court erred in
a. modifying the damages figure recited by the jury verdict form;
b. crediting Catahoula's 10% fault apportionment against T-Jack's 75% allocation;
c. calculating the amount of damages Concordia owes plaintiffs (after Catahoula's 10% fault was credited against T-Jack's liability); and,
d. casting 60% of the costs against Concordia.
In its appeal, Catahoula assigns error to:
1) the trial court's grant of plaintiffs' new trial motion, and also its subsequent modification of the judgment originally entered;
2) the jury's $2 million wrongful death award;
3) the trial court's computations after fault was re-apportioned among the parties; and,
4) the trial court's 40% assignment of costs against Catahoula.
We address each of the foregoing errors within our fault and quantum analysis. As an ancillary matter, plaintiffs' insistence that the trial court erred in admitting into evidence the results of T-Jack's BAC test will not be further explored. Concordia contends, and we concur, that the "law of the case doctrine"[2] precludes plaintiffs from lodging this error as the supreme court has already concluded that plaintiffs' arguments pertain to the weight and not the admissibility of T-Jack's BAC test. T-Jack's blood alcohol reading was .20 when the accident occurred.

IV.

FACTS
On Saturday, September 15, 1990, T-Jack Owens, a then sixteen (16) year old high school student, attended the Soybean Festival in Jonesville, Louisiana. Throughout that afternoon, T-Jack spent most of his time "looping" (i.e. cruising around) Jonesville in the passenger seat of a pick-up truck being driven by John Hardie, T-Jack's friend. As they "looped," T-Jack and John socialized with friends and drank several beers. Near 5:30 p.m., T-Jack and John decided to visit Pam Ryan, John's sister. The young men wished to shower there and change clothes in preparation for the Soybean Festival Street Dance, an event scheduled to occur later that evening. John dropped T-Jack off on the other side of Jonesville to allow T-Jack to retrieve his 1986 Chevrolet Silverado pick-up. From there, John trailed T-Jack to Pam's place.
At approximately 6:10 p.m., T-Jack drove his truck southerly along Patten Road, a two-lane, gravel road that winds through a stretch of Catahoula Parish. While rounding a ninety-degree (90°) dog-leg-left curve, T-Jack *443 lost control of his pick-up, swerved into the brush, and struck a wooden utility pole. The pole was 45' long; 38'6" stood above ground. Upon impact, the following events occurred instantaneously:
(1) the pole's lumber split in two at the 2'6" above-ground mark;
(2) the "transformer rack," a steel-framed rack that supported two half-ton transformers, fell free from the stricken pole and landed atop T-Jack's truck cabin[3]; and,
(3) the cabin came to rest upon the back of T-Jack's neck, sharply forcing the young man's head forward with his chin to his chest.
At trial, John testified that he trailed too far behind T-Jack to actually witness the driver losing control; instead, the first thing John noticed was flying sparks bursting from the sheared utility pole. John then watched as both transformers came crashing down atop T-Jack's truck cabin. Risking electrocution, John immediately ran from his vehicle to the passenger side of T-Jack's truck. Seeing movement in T-Jack's right arm, John tried to converse with T-Jack, but he would not respond. John then hurried to Pam's home to secure emergency assistance.
At 6:38 p.m., state trooper Joseph Trunzler reached the accident scene and began his investigation. At trial, Trunzler explained that measurements taken in the course of his investigation revealed that T-Jack lost control in the following manner:
He came on the inside [left] of the curve, went back across the road for twenty-four feet ten inches [24'10"], got on the right hand shoulder, got it straight, went down that road for about almost fourteen feet [14'] on the shoulder, what little shoulder there was, then went off the road for seven feet [7'] right into the pole. And then after it hit the poleimpact with the pole, it [T-Jack's truck] moved nine feet [9']. I don't know whether when it hit, it went... around [the pole stump] or whether it went straight [over the pole stump]. I don't believe it went straight across the pole because the stump was there.
By 6:44 p.m, emergency medical technicians (EMT's) converged on the accident scene; likewise, Jerry Alwell, Catahoula Parish Deputy Coroner, also arrived on the scene.
Upon extricating T-Jack's corpse, EMT's observed no visible cuts, bruises, or bleeding; however, the paramedics did observe that a blue discoloration extended from T-Jack's nipples to his face. By 7:32 p.m., EMT's prepared T-Jack's body for transport to the Riverland Medical Center (RMC) of Ferriday, Louisiana.

V.

PROCEDURAL HISTORY

A. Parties' Contentions
On March 1, 1991, Jack Owens, Jr. and Anne Reeves Faillace filed a petition for wrongful death and survival damages naming both Concordia and Catahoula as defendants. Plaintiffs maintained that Catahoula, as custodian of Patten Road, was negligently liable for T-Jack's death because it:
1) failed to post warning signs of any nature (i.e. speed limit, curve ahead etc.) on Patten Road;
2) permitted Concordia to place and maintain its utility pole in a location that posed a hazard to Patten Road motorists;
3) failed to discover and correct the hazardous condition posed by the close proximity of Concordia's utility pole to Patten Road; and,
4) failed to maintain in a safe condition the ninety degree (90°) curve abutting Concordia's utility pole.
*444 Likewise, plaintiffs alleged that Concordia, as the utility pole's owner/custodian, was negligent because the company:
1) failed to properly install/secure the pole's transformers so as to prevent said transformers from dislodging;
2) placed the utility pole at the edge of Patten Road and, thereby, presented a hazard to motorists;
3) failed to discover and correct the dangerous condition caused by the utility pole's close proximity to Patten Road;
4) failed to relocate the pole to a safe distance from Patten Road despite having
(a) knowledge of a prior accident at the site of T-Jack's current accident, and
(b) a request (filed after the prior accident) that the pole be relocated.
In addition to seeking wrongful death and survival damages, each parent sought special damages to cover the property loss occasioned by T-Jack's fatal accident as well as the funeral, burial, and related expenses incurred on account of their son's demise.
Catahoula and Concordia denied liability and alleged that T-Jack was comparatively negligent because he was under the influence of alcohol and failed to maintain control of his vehicle. Concordia also cross-claimed Catahoula under La.Code Civ.P. art. 1071. Concordia alleged that Catahoula was negligent because it failed to:
1) post warning and advisory signs designed to apprise motorists of the road's condition, the oncoming curve, and the lawful speed limit; and,
2) maintain the roadway's surface (i.e. Catahoula purportedly allowed Patten Road to become rutted, and the insufficient amount of gravel did not permit safe driving).
Concordia urged the court to compel Catahoula to indemnify Concordia in the event of an adverse judgment rendered against Concordia upon plaintiffs' main demand.

B. BAC Test: In Limine Motions Abound
On June 17, 1993, Catahoula moved in limine to admit the results of T-Jack's BAC test. Likewise, on June 22, 1993, plaintiffs retorted by filing their own in limine motion to exclude such results on grounds that:
(a) the chain of custody could not be established with any degree of certainty; and
(b) the results were unreliable.
The district court granted plaintiffs' limine motion. Thereafter, both Concordia and Catahoula sought writs that were denied by this court; however, defendants filed writ applications that were granted by the supreme court. In a 4-3 decision, the supreme court reversed the trial court's ruling to exclude T-Jack's BAC results. The court explained tersely that the "[i]ssues raised go to the weight of the evidence, not its admissibility." Owens v. Concordia Electric Cooperative, Inc., et al 94-0135 (La.1/19/94); 629 So.2d 1189. Plaintiffs' case was remanded for further disposition consistent with the supreme court's opinion.

VI.

LAW & DISCUSSION

A. Fault
All parties assign error to the trial court and jury's fault apportionments. In determining whether liability exists under the facts of a given negligence case, we analyze the situation using a duty-risk formula, in which we consider the following:
(1) Was the affirmative conduct a cause-in-fact of the resulting harm?
(2) Was there a duty owed?
(3) Was that duty breached?
(4) Was there a duty to protect this plaintiff from this type of harm arising in this manner? Stated alternatively, was the risk of harm within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120 (La.1987); Shelton v. Aetna Casualty & Sur. Co., 334 So.2d 406 (La.1976); Hill v. Lundin & Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972); THOMAS C. GALLIGAN, JR., "Hill v. Lundin & Associates" Revisited: Duty Risked to Death? (1993).

*445 B. T-Jack
Our 65% fault assessment against T-Jack is based on evidence that, at the time of the decedent's fatal accident, his blood alcohol level exceeded the legal level of intoxication and the loss of control of his vehicle. However, under our comparative fault system, T-Jack's fault in causing the accident does not relieve Concordia of liability for causing the harm. Campbell, 648 So.2d 898; Boutte v. Nissan Motor Corp., 94-1470 (La.App. 3 Cir. 09/13/95); 663 So.2d 154.

C. Catahoula
The record contains sufficient and reasonable evidence that Catahoula failed to sign the 90° dog-leg-left curve on which T-Jack lost control and, likewise, Catahoula failed to maintain the curve in a safe condition. A 10% assessment of fault against Catahoula is reasonably warranted.
Catahoula insists that T-Jack lost control on Patten Road because he was inebriated, speeding, and/or was inattentive. However, we conclude that, at the very least, Catahoula was concurrently at fault for the harm T-Jack suffered.
Perhaps T-Jack lost control on Patten Road because he was intoxicated, speeding, and/or inattentive and perhaps he lost control because of the poor design of the curve, or the poor condition of the curve's surface, combined with the lack of street signs advising T-Jack of the curve's onset and a suitable speed at which to navigate it. In fact, differing combinations involving all or fewer of these factors perhaps combined to cause T-Jack's loss of control. However, T-Jack's failure to maintain control of his vehicle does not relieve Catahoula of its duty to erect warning signs sufficient to warn motorists of hazardous conditions, including 90° curves. T-Jack's negligence in losing control of his vehicle as well as Catahoula's failure to sign Patten Road combined to cause T-Jack's harm. The fact that more than one party can Contribute to a harm is the raison d'être of our comparative fault system. Campbell v. Louisiana Dep't of Transp. & Dev., 94-1052 (La.01/17/95); 648 So.2d 898.
Undoubtedly, Catahoula owed and breached its statutory duty to sign Patten Road's curves properly. Furthermore, Catahoula owes the foregoing duty not only to the prudent driver, but also to the imprudent and/or inattentive driver. Molbert v. Toepfer, 550 So.2d 183 (La.1989) (citing Ledbetter v. State, 502 So.2d 1383 (La.1987); Burge v. City of Hammond, 494 So.2d 539 (La.1986)). Therefore, Catahoula's argument that T-Jack was speeding is unavailing since Catahoula failed to post signs advising motorists of the suitable speed at which to navigate its curve. Moreover, T-Jack's intoxication or alleged inattentiveness does not preclude plaintiffs from recovery in Louisiana.
Catahoula's breach of its statutory duty gives rise to liability if T-Jack's injury is within the scope of protection afforded by the duty which the defendant breached. The risk that a driver might lose control in a 90° curve of an unsigned, rutted, dirt road is certainly within the scope of protection afforded by Catahoula's duty to sign the curve.

D. Concordia
Our 25% fault assessment against Concordia is responsive to the following evidence: (1) Concordia positioned its utility pole within seven feet (7') of the curve's narrow shoulder; (2) two prior accidents occurred involving the same utility pole; (3) the transformer rack was affixed to the pole by two 5/8" bolts instead of two 3/4" bolts as recommended by the transformer rack manufacturer; (4) the transformer rack dislodged from the utility pole upon impact; and, (5) two half-ton transformers crashed down atop and crushed T-Jack's truck cabin.
Private entities using the area alongside a roadway have a duty not to create obstructions or perilous conditions for motorists who inadvertently or by reason of necessity stray from the traveled portion of the roadway. Nicks v. Teche Elec. Coop., Inc., 93-1418 (La.App. 3 Cir. 06/01/94); 640 So.2d 723, writ denied, 94-1710 (La.10/07/94); 644 So.2d 640. In other words, utility companies owe motorists a duty to keep the "clear recovery zone" free from obstructions. See Oster v. Department of Transp. & Dev., 582 So.2d 1285 (La.1991); Nicks, 640 So.2d 723. Concordia's placement of its utility pole within *446 seven feet (7') of a 90° dog-leg-left curve on Patten Road constitutes a breach of the company's duty. Accordingly, Concordia's placement of its utility pole within the "clear recovery zone" plus T-Jack's negligence in losing control of his vehicle and striking the pole combined to concurrently cause harm to T-Jack. The risk that a motorist would strike a utility pole placed within 7' of a 90° dog-leg-left curve is clearly within the scope of protection afforded by the utility company's duty to keep the "clear recovery zone" free from obstructions.
In assembling and maintaining its utility pole fixtures, Concordia bears a duty to behave as a reasonably prudent utility. The transformer rack manufacturer expressly instructed its industrial customers to use 3/4" bolts when fastening transformer racks to utility poles; likewise, plaintiffs' evidence of prevailing industrial practice demonstrated that 3/4" bolts were customarily used to affix the type of rack and transformers involved in T-Jack's accident. Bill Adams, an electrical engineer who testified as an expert for the plaintiffs, testified that a 3/4" bolt is stronger and less susceptible to shearing than a 5/8" bolt. Had Concordia used the proper-sized bolts, 3/4" rather than 5/8," the transformer bracket would have been less likely to have fallen, Adams concluded. In response to evidence that Concordia deviated from both industry custom and manufacturer specifications, we conclude that Concordia behaved unreasonably in using 5/8" bolts to affix its transformer rack to the stricken pole. The risk that an improperly installed transformer rack would fall free from a stricken utility pole upon a motorists impact therewith is certainly encompassed by the utility company's duty to properly install the rack.
In apportioning fault, we consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). The Watson court further explained:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actors, whether superior or inferior; and,
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
And, of courseas evidenced by concepts such as last clear chancethe relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id. at 974 (emphasis ours).
When T-Jack's vehicle left the roadway, the decedent could take no steps to prevent the risk of harm occasioned by the vehicle's impact with the utility pole. The danger of striking, through inadvertence or necessity, a utility pole placed within 7' of a 90° curve is a considerably high risk of which Concordia on account of two prior accidents involving its polewas certainly aware. Clearly, Concordia had superior capacity to place its utility pole more than 7' from Patten Road so as to permit motorists who, through inadvertence or necessity, suddenly require a clear recovery zone when attempting to traverse the 90° curve.
Except to the extent that T-Jack's negligence set the accident in motion, T-Jack had no control over the resulting harm caused by the impact of his vehicle with the wooden utility pole. T-Jack was powerless to prevent the transformer rack from dislodging from that pole. However, contrary to installation instructions provided by the transformer rack's manufacturer, Concordia secured the fallen rack to its pole using two 5/8" machine bolts instead of two 3/4" bolts. Based on our review of the record, it is clear that Concordia's fault in causing T-Jack's death is reasonably fixed at 25%.

*447 VII.

QUANTUM
Both defendants contend that the jury erred in granting plaintiffs $2 million in general damages. While it is always extremely difficult to attempt to quantify damages for the loss of a loved one, especially a child, we agree that the awards were somewhat excessive.
T-Jack was an exemplary young man who was much admired by his family and friends. As a testament to the respect for him and evidence of the high esteem in which he was held, Harrisonburg High School, a school T-Jack never attended, dedicated its annual all sportsmanship trophy in his honor. His parents' relationship with him had not been affected by their divorce six years before his death. They shared joint custody of him. He lived with his mother, Anne Faillace, but stayed with his father, Jack Owens, Jr., almost every weekend.
T-Jack loved the outdoors and spent much time fishing and hunting with his father who testified that he "could not hardly imagine outliving [T-Jack]." He went everywhere with his father "from an early age." After the divorce, T-Jack spent one year with his father. T-Jack, according to Jack Owens, Jr., was probably the catalyst which kept he and his ex-wife, T-Jack's mother, communicating and working together. He served as an intermediary in relating his parents' problems to each other.
Anne, his mother, was so devastated and emotionally destroyed by this unfortunate tragedy that she refused to go into his room for about one year after T-Jack's death. Such psychological withdrawal is understandable in view of the close affinity and bond shared by them.
The numerous photographs introduced into evidence poignantly illustrate the intimate familial relationship between T-Jack and his parents.
The loss of life of a family member is insusceptible of any objective measurement. Any award is arguably arbitrary and, of course, dependent upon our perception of the evidence. Given the evidence just described, we find that an award of $350,000.00 for wrongful death damages to each parent is appropriate and reasonable.

VIII.

CONCLUSION
For the foregoing reasons, Concordia Electric is cast with 25% of the fault and Catahoula Parish with 10% of the fault in causing the harm suffered by the plaintiffs, Jack Owens, Jr. and Anne Reeves Faillace, for the death of their son, Jack Forsyth Owens, III ("T-Jack"). We award $350,000.00 in general damages to each plaintiff as well as $6,645.37 in special damages to Jack Owens, Jr.
Concordia is ordered to pay damages in the following manner:

Jack Owens Jr.
 (1) $87,500.00 25% of $350,000.00 in wrongful
 death damages.
 (2) $ 1,661.34 25% of $6,645.37 in special damages.
Anne Reeves Faillace
 (1) $87,500.00 25% of $350,000.00 as wrongful
 death damages.

Likewise, Catahoula is hereby ordered to pay damages as follows:

Jack Owens Jr.
 (1) $35,000.00 10% of $350,000.00 in wrongful
 death damages.
 (2) $664.54 10% of $6,645.37 in special damages.
Anne Reeves Faillace
 (1) $35,000.00 10% of $350,000.00 in wrongful
 death damages.

Costs of this proceeding are cast equally against both defendants.
The judgment of the trial court is amended and, as amended, affirmed.
DOUCET, C.J., dissents in part and concurs in part and would apportion fault at 75% to Jack Owens, III and 25% to Concordia Electric Cooperative, Inc.
WOODARD, J., concurs in part and dissents in part and would uphold the original apportionment of fault by the jury assigning *448 75% to Jack Owens, III and 25% to Concordia Electric Cooperative, Inc.
NOTES
[1] The parties disagree upon whether jurors intended to award each plaintiff $250,000.00 before or after plaintiffs' recovery is reduced by T-Jack's comparative fault percentage.
[2] The "law of the case" is a policy by which an appellate court will not, on a subsequent appeal, reconsider its earlier ruling in the same case. That policy applies against those who were parties to the case when the prior decision was rendered and who had their day in court. Some reasons for applying the policy are: avoiding indefinite re-litigation of the same issue; obtaining consistent results in the same litigation; fairness to both parties; and affording one opportunity for argument and decision of the matter at issue.

Burns v. Sabine River Auth., 614 So.2d 1337, 1339 (La.App. 3 Cir.), writ denied, 617 So.2d 935 (La.1993) (citing Petition of Sewerage & Water Bd. of New Orleans, 278 So.2d 81 (La.1973); Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971).
[3] Figuratively, the transformer rack frame is designed like an open book. Each half-ton transformer hangs from the opposite outer "margins" of the book. The frame's "binder" is affixed to the utility pole by two 3/4" machine bolts that fit within linear slots on the rack frame. The uppermost slot resembles an inverted key-hole, while the lower slot resembles an inverted key-hole that is open at bottom. Racks are affixed by being lowered onto machine bolts that are partially screwed into pre-bored pole holes. The rack is then secured by tightening both machine bolt lock nuts. Once fastened, the transformer rack slots fit snugly between the bolt head and utility pole, allowing the rack to suspend therefrom.