747 So.2d 1159 (1999)
Jesse A. MENDOZA
v.
Michael G. MASHBURN, et al.
Sean Michael Schneider
v.
Michael G. Mashburn, et al.
Nos. 99-CA-499, 99-CA-500.
Court of Appeal of Louisiana, Fifth Circuit.
November 10, 1999.
Rehearing Denied December 6, 1999.
Writ Denied February 18, 2000.
*1162 Richard P. Ieyoub, Attorney General, Rodney A. Ramsey, Assistant Attorney General, Louisiana Department of Justice, New Orleans, for Appellants State of Louisiana, Department of Public Safety and Corrections.
Michael J. Winsberg, Jerome M. Winsberg, New Orleans, for Appellee Sean Michael Schneider.
Michael R. Allweiss, Max J. Cohen, Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P., New Orleans, for Appellee Jesse A. Mendoza.
James G. Wyly, III, Douglas R. Elliott, Deutsch, Kerrigan & Stiles, L.L.P., New Orleans, for Appellees Progressive American Insurance Company and Michael Mashburn.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and THOMAS F. DALEY.
CANNELLA, J.
The present appeals are taken from two judgments notwithstanding the verdict (JNOV), and from a jury verdict. The jury granted judgment in favor of the plaintiffs Jesse Mendoza, Steven and Edith Schneider and against defendants, Michael Mashburn and his insurer, Progressive American Insurance Company (Progressive). Mashburn and plaintiffs moved for a JNOV in their favor, which the trial court granted, finding defendant, the State of Louisiana through the Department of Public Safety and Corrections, Department of the State Police (State), to be at fault. The State has appealed both JNOVs and the jury verdict on damages as to the Schneiders. Mendoza has answered the appeal.
On October 10, 1995, at about 12:35 a.m., Mashburn lost control of his vehicle on 10 (heading East) on the downslope of the Bonnabel Boulevard overpass and struck the left guardrail. His vehicle came to rest on the roadway blocking the left lane. A field sobriety test revealed that Mashburn was legally intoxicated at the time of the accident. Minutes later, an auto driven by Kristine Polizzi came over the overpass and struck the side of the Mashburn vehicle. The impact knocked the Polizzi car across all three lanes of the interstate and struck the right guardrail, where it came to rest blocking the right lane.
The State Police were summoned to the scene and arrived within approximately 7 minutes after contact with the dispatcher. Traffic had begun to accumulate as the State Police approached the crest of the overpass. Trooper Jeffrey Diez stopped his vehicle on the down slope of the overpass, about 75 feet behind the Polizzi vehicle. As he surveyed the scene and began to transmit requests for tow trucks, a motorcycle operated by Sean Schneider slid *1163 into the rear of another car stopped in the traffic. He was thrown off and did not appear to be moving. Moments later, an off-duty deputy at the scene informed Trooper Diez that another motorcyclist, Mendoza, had been involved in an accident further back up the highway, approximately 100 feet behind the trooper's vehicle. Both motorcycle accidents occurred on the downslope of the overpass. Mendoza was taken to the emergency room at East Jefferson Hospital. As a result of the collisions, Mendoza sustained serious and permanent injuries, including a partial leg amputation and Sean Schneider was killed.
Mendoza sued Mashburn, Progressive and the State. Sean Schneider's parents, Steven and Edith Schneider, also filed suit against the same parties. With regard to the State, it was alleged that the State Police breached their duty to warn oncoming traffic of the danger of the accident on the downslope of the overpass. The suits were consolidated and both cases were tried to the same jury. Following the trial, the jury returned a verdict finding Mashburn to be 25% negligent and both Mendoza and Sean Schneider to be 75% negligent; the State was found free of fault. The jury awarded Stephen Schneider the following damages: $17,630 funeral and burial expenses; $500,000 mental anguish; and $500,000 loss of love and affection. Edith Schneider was awarded damages in the same amounts except for the funeral expenses, for a total award to the Schneiders of $2,017,630. Mendoza was awarded $150,000 for physical pain and suffering; $10,000 for emotional distress; $10,000 for loss of enjoyment of life; and nothing for disability. As special damages he was awarded $94,710 for past medical expenses; $1,500,000 for future medicals; $12,000 past lost wages; $140,000 future lost wages.
Mashburn, Schneider and Mendoza each moved for a JNOV relative to fault. Mendoza additionally urged that the jury was unreasonable in its general damage award to him. The trial court granted the motions, finding that both plaintiffs were 50% at fault, and that the State was also 50% at fault. Further, the trial court found that the Mashburn's negligence was superceded by that of the plaintiffs and the State. Mashburn was dismissed from the suit. Relative to Mendoza, the trial court further found there was insufficient evidence to support the jury's award of future medical expenses and that the jury erred in its awards for emotional distress as well as disability and loss of enjoyment of life. The trial court then awarded $150,000 for physical pain and suffering; $150,000 for past, present and future emotional distress; $100,000 past, present, and future disability; $100,000 for loss of enjoyment of life; and $250,000 future medical expenses. The jury awards for past and future lost wages, and past medical expenses were confirmed.
The State appealed the granting of the JNOVs with regard to liability; also on appeal is the jury's general damage award in favor of the Schneiders and the exclusion from evidence of certain medical records of Sean Schneider and Mendoza. Mendoza filed an answer to the appeal contending that the reduction of future medical expenses was improper.

STANDARD OF REVIEW
A JNOV is authorized under La.Code Civ. Pro. art. 1811. We recently addressed the applicable standard of review in Kistner v. King, 98-641, (La.App. 5th Cir.12/16/98), 726 So.2d 68:
This court stated the stringency of the law on judgments notwithstanding the verdict in State of Louisiana, Dept. of Transp. and Dev. v. Scramuzza, 95-786 (La.App. 5th Cir.4/3[0]/96), 673 So.2d 1249:
"A JNOV is properly granted `only when the facts and inferences are so strongly and overwhelmingly in favor of one party' that the trial judge believes reasonable men could not have arrived at a contrary verdict." Adams v. Security Ins. Co. of Hartford, 543 So.2d 480, 486 (La.1989). Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991).

*1164 . . . . .
In considering a motion for JNOV, the trial court may not weigh the evidence, substitute its judgment of facts for that of the jury, or pass on the credibility of witnesses. (Cites omitted.) Furthermore, the court should consider all of the evidence, not just the evidence that supports the non-mover's case, and should give the non-mover the benefit of every legitimate and reasonable inference that can be drawn from the evidence by the jury. State, Department of Transp. and Dev. v. Wahlder, 554 So.2d 233 (La.App. 3rd Cir.1989); McClain v. Holmes, 460 So.2d 681 (La.App. 1st Cir. 1984).
This court, in reviewing a JNOV, must use the aforementioned criteria in deciding whether or not the motion was properly granted. Anderson v. New Orleans Public Service, supra. If the reviewing court determines that the trial court erred in granting the motion, because reasonable men in the exercise of impartial judgment might reach a different conclusion than the one proposed by the moving party, then the JNOV must be reversed and the jury verdict should be reinstated. Anderson v. New Orleans Public Service, supra.

Kistner v. King, supra, at p. 70.
On review, this court must determine if the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict.
... the legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers are duty bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La.App. 3rd Cir.1991). In Mathieu[v. Imperial Toy Corp.], 94-0952 at 10[ (La. 11/30/94)], 646 So.2d at 325, this court stated that the scope of an officer's duty is to choose a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach.
Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173. See also Edwards v. Daugherty, 97-1542 (La.App. 3rd Cir.3/10/99), 729 So.2d 1112. In the present case, the troopers had the affirmative duty to see that motorists were not subjected to unreasonable risks of harm. It must next be determined whether this duty was breached; that is, whether the conduct of the troopers was reasonable under the circumstances.
The parties stipulated at trial that Mashburn was involved in the accident, in which his car blocked the left lane of the I-10 overpass at Bonnabel Boulevard, on the downslope, and that he was legally intoxicated at the time.
On the night of the accident Christopher Maurin, a state trooper, was riding in a patrol car with Trooper Lavone Smith. They heard a call to attend to an accident at the overpass of I-10 and Bonnabel. Because they were in St. John Parish, it took about 20 minutes to arrive at the scene. They were not the officers who first responded. Trooper Maurin was instructed to assist traffic in exiting at Bonnabel Boulevard. He set up traffic cones and flares and used a flashlight to direct the flow of traffic. After about 25 minutes, other troopers came to direct the traffic and Maurin went to the accident site. Because there were so many vehicles involved, he volunteered to help Trooper Diez handle one of the accidents.
At the scene, Trooper Maurin investigated the Mendoza accident. After measuring skid marks and talking to a witness, he, along with Trooper Diez, concluded *1165 that Mendoza had been traveling at 70 miles per hour. On the accident report, Maurin checked the term "hill crest" as a "visual obscurement" and noted this as the primary contributing factor in the accident.[1] However, at no time has he ever spoken with, or obtained a statement directly from, Mendoza.
Trooper Maurin testified that when dispatched to an accident scene, his job is to quickly get there, assess the situation, and make it safe for everyone. Depending on the location, he may or may not set up on top of an overpass. Each case is different.
On cross examination he agreed that it is dangerous when an accident is on the down side of an overpass since approaching drivers are prevented from seeing the accident. In these instances, it is usually his practice to park his car at the top of the overpass with lights flashing to warn oncoming motorists. This is the method taught at the police academy.
Trooper Diez testified that he and Trooper Steve Orgeron, a recent graduate of the police academy and still in training, responded to a call for a "signal 20", an accident without injury. Although in his deposition he had not recalled being told the accident was on the overpass, after hearing an audiotape of the actual dispatch he conceded that he must have been told the accident was on the overpass. Trooper Diez did not call in to confirm the location, assuming that the dispatcher had given all the information to be had at that time. Trooper Diez agreed that the down side of an overpass is a dangerous location. As Trooper Diez approached the overpass, he saw no indication of the actual site of the accident, but did see brake lights at the crest. He stated that the location given for accidents is not always entirely accurate and that the accident could have been as far down as Oaklawn. At that time of night, there is generally not much traffic absent some problem. Two eighteen-wheelers in front of his car obscured his view of the accident, but at or just before the crest he turned on the flashing lights. When the trucks pulled over, he saw the Pollizzi vehicle blocking the right lane. He pulled to a stop about 70 feet behind that vehicle in the right lane. After the trucks passed he could see the Mashburn vehicle in the left lane. At the time he wondered if he could back up to try to get to the top of the overpass, but because there were cars behind him and all three lanes were already blocked, he couldn't get to the top. He knew it was a dangerous situation.
The police manual requires that upon arrival at the scene of an accident, "the officer will insure the patrol unit is parked in a position where the emergency lights are readily visible to other traffic approaching the scene." The manual also directed that portable lights shall be placed so as to be readily visible to oncoming traffic in all directions; however, the department does not have such portable lights. Trooper Diez conceded that Trooper Orgeron could have lit flares at the crest of the overpass while he went down to the original accident scene.
Trooper Diez estimated that the motorcycle accident involving Schneider occurred about 1 minute and 20 seconds after he arrived at the scene. He was concerned about traffic stacking up, but his primary function was to attend to the Mashburn accident. He could not predict what was going to happen behind him. After radioing for wreckers, he heard a crash and Trooper Orgeron informed him that a motorcycle accident (involving Sean Schneider) had occurred. While seeing to Sean Schneider, within about 1 minute he was informed of the Mendoza accident.
In the time frame involved, Trooper Diez did not think he could have done anything else. In the accident report which he filled out, he did not find any "visual obscurements" but did note that according to his measurements, the motorcyclists had been speeding at approximately 73 miles per hour.
*1166 Trooper Lavone Smith testified that he filled out an accident report on an auto collision which occurred after the 2 motorcycle accidents. On that accident report, he checked "hill crest" as a vision obscurement and agreed that speed was not a factor in that particular incident. He later testified that the night of the accident was his 3rd day on the job and from what he knows now, "vision obscurement" was not the hill crest.
Trooper Orgeron testified that he was new on the job at the time of the accident. As the patrol car in which he rode with Trooper Diez approached the overpass, he could see brake lights and knew the accident had to be on the down slope. They were proceeding down the overpass when they noticed the wrecked car. At that time there was very little traffic and there were no cars behind them. There was nothing to prevent them from stopping at the top of the overpass, but there was no way they could have done so and protected the scene below. Now, if there is an accident on an overpass and there are vehicles just down below the top of that overpass, he will come to a stop at the top. If they are further down, he will position his car further down.
Trooper Paul Toups heard the dispatcher on the date of the accident. Later, Trooper Diez called for assistance and backup because the accident had occurred at a bad location. Trooper Toups responded when he heard that other accidents had begun to occur. After helping get Mendoza into the ambulance, he helped secure the scene.
Rhonda Flores was traveling on I-10 with her husband on the night of the accident when they saw the approaching police car with its flashing lights. At the top of the overpass they looked down and saw an accident, so they slowed down and came to a stop. She heard a motorcycle, heard the clanking of metal and saw the motorcyclist hit a car. He did not appear to be slowing down. Her husband testified the same.
Robert Idzi exited the interstate and was at the light at Bonnabel Boulevard when he heard the accident. Cars were trying to steer around the debris on the road and he tried to clear some of it, since there were cars blocking the right and left lanes. The police arrived about ½ hour after the accidents occurred and there was a lot of backed-up traffic. He saw the police car pull up and he started to explain to the officer what happened when he heard another accident and saw a motorcycle go down between the left and center lanes as it tried to maneuver between cars. The troopers had just gotten there when the motorcycle accident happened.
Lieutenant Ralph Mitchell, a shift commander at Troop "C", testified that in addition to that job, he is a senior supervising instructor for accident investigation for the State Police. He did not testify as an expert. Because every accident is different, Lieutenant Mitchell stated that the same procedures cannot be applied to each and every accident. The procedure is to proceed directly to the scene as quickly and safely as possible, locate the accident and notify the office. They are to analyze potential hazards and start the investigation, start requests for additional equipment, analyze the road situation and control traffic. Warning devices are available, or the officer can use the flashing lights of his patrol car. Flares should be used with caution. Officers are taught to utilize the available equipment to the best of their ability. There are no specifics as to handling accidents on overpasses. The officers are supposed to find out from the dispatcher if the road is blocked and if there are injuries so that the proper equipment can be sent to the scene.
Dr. William Berg, an expert in the field of highway design, traffic safety accident reconstruction, human factors and civil engineering, reviewed the evidence including police reports, depositions, etc., and conducted his own studies. He estimated that the range of speeds of the two motorcycles when braking was initiated was between 77-79 miles per hour for Mendoza and between 83-84 for Sean Schneider. If the *1167 State Police had been positioned on the crest of the overpass, the flashing lights could have been seen from a half to one mile away and would dramatically increase the visibility. Perception-reaction time, the time in which the motorcyclists would first have seen the warning lights to the time they engaged the brakes in this case was 1.7 seconds. Dr. Berg felt that given the conditions that existed, the speeds that people were traveling and where certain features were, plaintiffs' response to the blocked lanes was clearly delayed. According to Dr. Berg, the basic reason for this is that the warning didn't come to them soon enough because it was over the crest rather than at or even in advance of it. Given the speeds of travel on that road, Dr. Berg opined that the warning which was provided was not positioned where people could reasonably make use of it successfully. There was a series of collisions due to the fact that the incidents were unexpected. Normally the whole freeway is not blocked and the blockage, which existed just over the crest, was hard to see until you were on top of it.
On cross-examination, Dr. Berg testified that if the plaintiffs had been going 5-10 miles per hour slower, they could have barely avoided the accident. The police lights would have been visible approximately 400 feet before they got to the overpass and it was another 400 feet to the police car itself. The flashing police light is a clear indication of a problem whereas the sight of brake lights ahead is not.
Dr. Richard Robertson, an expert in the field of accident reconstruction, traffic engineering and road design, reviewed the evidence and studies which he conducted and concluded that Mendoza was speeding at 66-75 miles per hour and that Sean Schneider's was speeding at 76-89 miles per hour. The photos submitted by Dr. Robertson were views of what a passenger in a car would see although motorcyclists are about 6 inches higher and therefore can see from a somewhat further distance. Depending on the speed at which they were traveling, the motorcyclist's perception-reaction time was 1.1-1.7 seconds. He agreed with Dr. Berg that the motor-cyclists had about 800 feet of stopping distance from the time they could have first seen the police lights. In his opinion, the motorcyclists were not able to stop because of their speed, which was beyond the capabilities of what the roadway design. However, he agreed that if the State Police had set up lights at the top of the overpass, the warning would have been perceived earlier and the motorcyclists would have had an additional 6,370 additional feet of warning.
Also introduced into evidence was an audiotape of the dispatch call. On that tape the dispatcher stated that the location of the accident was on the Bonnabel overpass. Further, there were copies of mandatory police procedures followed by the State Police. Procedural Order 301 states, in pertinent part, that the dispatcher shall obtain the exact location of the accident and that the investigation officers must proceed to the scene as quickly as possible, parking the unit properly and safely at the scene. They are required to safeguard the scene from further accidents. Procedural Order 304 also states in applicable part:
Use of Audible and Visible Warning Devices
Upon arrival at the scene of a call, such as an accident, the officer will ensure that the patrol unit is parked in a position where the emergency lights are readily visible to other traffic approaching the scene. Portable lights, if available, shall be placed so that they are readily visible to oncoming traffic in all directions.
In granting the JNOV the trial court said:
Instead of parking the patrol unit on the crest where the lights could be seen, Diez parked on the down slope where oncoming traffic could not see the patrol car's light prior to reaching the crest of the overpass. Further, despite Ogeron's [sic] testimony that they had flashlights and flares available in their patrol unit, *1168 neither he nor Diez placed these on the crest of the overpass to warn oncoming traffic. Had the troopers conformed to the State Police's Procedural Orders, Schneider would have been warned of the Mashburn-Polizzi accident in time to avoid his accident.
The State Police officers had a duty both to protect and secure the accident scene for which they were called, as well as to see that motorists are not subjected to unreasonable risks of harm. After considering the evidence and testimony, we conclude that the jury's verdict, under JNOV analysis, was one which reasonable persons, in the exercise of impartial judgment, could have rendered, namely that the State Police did not breach a duty owed to the motorcyclists.
The two motorcycle accidents took place within 1 to 2 minutes of the troopers' arrival at the scene. At that time, moderate traffic had begun to accumulate and the troopers were obliged to proceed down the crest before they could confirm the exact location of the accident. Once there, according to Trooper Diez, it was not possible to proceed back up in order to place warning signals. It is clear from all the testimony that the troopers did not have time to initiate further preventative measures before the motorcycle accidents occurred. Although it may have been preferable to have lights at the top of the overpass, a rational jury, under JNOV analysis, could have found that the police followed proper procedure and in proceeding directly down to the scene to protect that site, acted reasonably under the circumstances.
Additionally, we find that a rational jury could have found that the motorcyclists' speed, well in excess of the speed limit, was unquestionably the major cause of the accident. The evidence indicates that plaintiffs were unable to maintain control of their vehicles and skidded. Plaintiffs' expert agreed that if they had been traveling even 5-10 miles per hour slower, they would have been able to avoid the accident.
It was established that Mashburn was operating a motor vehicle while intoxicated and hit a guardrail on I-10 in a single car accident, obstructing the left lane of traffic, in violation of La. R.S. 14:98 (Operating a Vehicle While Intoxicated) and R.S. 32:58 (Careless Operation). When a vehicle is disabled and must be parked temporarily upon the main travel part of a highway, it is the motorist's duty to remove the vehicle as soon as possible [and to "protect traffic" until the vehicle is removed from the highway]. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742; Desadier v. Safeway Ins. Co., 97-1412 (La.App. 3rd Cir.4/8/98), 712 So.2d 925. In failing this series of duties, Mashburn was negligent and his negligence set the entire chain of subsequent events into motion. An initial tortfeaser will not be relieved of the consequences of his negligence unless the intervening cause superceded the original negligence and alone produced the injury. Domingue v. State Dept. of Public Safety, 490 So.2d 772, (La.App. 3rd Cir.1986). If the original tortfeasor could or should reasonably foresee the accident that might occur, he would be liable notwithstanding the intervening cause. Domingue, supra. It was entirely foreseeable that losing control of a vehicle, crashing into a guardrail at the foot of an overpass and obstructing traffic on an interstate highway would result in accidents by following, even speeding, vehicles.
Obviously, the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which he has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence....

Miller v. Louisiana Gas Service Co. 601 So.2d 700, 705 (La.App. 5th Cir.1992) citing W. Prosser, Law of Torts (4th ed.1971) at 273-4, 288.
*1169 The motorcyclists' injuries would not have occurred but for the initial accident caused by defendant Mashburn.
For the foregoing reasons, we find that the jury was reasonable in its assessment of liability. Therefore, we hold that the JNOVs were improperly granted on the issue of liability and negligence, and the jury verdicts on that issue are reinstated.
Under La.Code Civ. Pro. art 1811, a motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues. Therefore, we must review the portion of the JNOV on the issue of damages awarded to Mendoza.

MENDOZA'S DAMAGES
In his motion for JNOV, Mendoza contended that the general damage award was inadequate. In granting the motion, the trial court found the jury erred in its award for emotional distress, loss of enjoyment, and disability and increased the general damage award and granted damages for disability. Further, the trial court determined that the award for future medical expenses was unsupported by the evidence and reduced it accordingly.
On appeal, Mendoza avers that it was error to decrease the jury's award for future medical expenses. According to Mendoza, this item of damages was not at issue on the JNOV, and further, the jury award was justified by the evidence at trial. Mendoza does not dispute the increase in general damages or granting of the disability awards and the defendants do not appeal those issues.
The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in Scott, supra, i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of Coco, supra.

Langlinais v. Figueroa, 93-979 (La.App. 5th Cir.3/29/94), 636 So.2d 983, 988.
Under the evidence presented, it is clear that reasonable men in the exercise of impartial judgment could not differ in concluding that Mendoza, in losing a leg, suffered some extent of disability. Further, on review it is apparent that considering the impact of the injury on Mendoza, the awards for physical and emotional suffering and loss of enjoyment of life were unreasonably and abusively low. Therefore the trial court correctly granted a JNOV as to damages.
Once a trial court has granted a JNOV on the issue of damages, it must conduct its own independent assessment of the damages as trier of fact, and its conclusion is reviewed on appeal for an abuse of discretion. See Anderson v. New Orleans Public Service, Inc., 583 So.2d 829. (La. 1991); Langlinais v. Figueroa, supra; Doe v. Doe, 94 2284 (La.App. 1st Cir.6/23/95), 657 So.2d 628, 632.
Dena Theriot, a psychiatric social worker who treated Mendoza, testified that as of the date of trial, plaintiff was "very much" in need of continued therapy, although he did not require inpatient hospitalization. He should undergo an intense therapy, seeing a variety of therapists from different disciplines for a period of 3 weeks at the cost of $4,500. Following that, he should continue weekly therapy at $70 per hour for a minimum of 1 year. However, Mendoza had been discharged prior to trial because no significant progress had been made.
Scott Sabolich testified by deposition in Oklahoma relative to the costs of prostheses for Mendoza. He testified that minor adjustments to the leg prosthesis could be *1170 done locally, but there were problems connected with that (such as voiding the warranty). Patients should come in every 6 months for a check up at the Oklahoma facility. In addition to the regular leg prosthesis, Sabolich recommended a "water leg" to allow plaintiff to enjoy various water activities. This item costs about $10,000.
Dr. Cynthia Glass testified that Mendoza had problems with his leg prosthesis and that he had thin skin in the area of amputation which might or might not present problems in the future, requiring a "free flap" procedure.
Dr. Philip Farris testified that in regard to future care, 1 to 2 follow-up visits a year for prosthesis management would not be unusual, and that Mendoza would need 5 to 6 more prostheses in his lifetime.
Dr. Gary Glynn, a physician specializing in rehabilitation, conducted a medical evaluation of Mendoza. Among other things, he testified that Mendoza would need 20 to 30 visits with a rehabilitation specialist over his lifetime and that Mendoza did not express any desire to see a psychiatrist in the future. House modifications appeared unnecessary since Mendoza had no difficulty getting around in his home. He felt a prosthesis replacement would be appropriate every 4 to 5 years and that the local price for such prosthesis was around $10,000 or $11,000.
Dr. Robert Voogt, a rehabilitation specialist, testified as an expert in the field of rehabilitation and life care planning. He stated that Mendoza suffered permanent disability. He contacted vendors to find out the costs of prostheses and of maintenance. The average prosthesis must be replaced in 2 to 5 years and costs $14,979, plus $2,621 for repairs and adjustment. Dr. Voogt determined that yearly costs for medical evaluations and treatment, therapeutic evaluations, treatment, maintenance, equipment and travel varied from $40,367 to $79,787 per year depending on the level of support care which increases with Mendoza's age. Household assistance beginning at age 40 through age 74 was valued at a range of $14,166 to $53,586. Also included were certain costs such as modifications to Mendoza's home of $40,000 to $50,000, which the witness stated should be considered as "just a possibility" if Mendoza spent more time in a wheelchair. Those modifications were not needed at the present time.
Harold Asher, an expert in the field of economic loss projection, testified that Mendoza's life expectancy is 40 years. Asher testified that he was presented with information from Dr. Voogt relative to the Life Care Plan for Mendoza. In calculating costs for prosthetic equipment, Dr. Voogt figured in the costs of regular as well as water appliances and assumed a replacement every 3 years. Asher calculated the present value of this care as drawn up by Dr. Voogt at $2,900.000. Asher agreed that if Mendoza's prosthesis was obtained locally then certain travel expenses would be unnecessary.
Dr. Kenneth Boudreaux testified as an economic expert. He testified that Mendoza's future life expectancy was approximately 47 years from the date of trial. He calculated how much money Mendoza would need to invest so that what he could earn on the investment would pay for the Life Care Plan (of Dr. Voogt). That amount was between $111,930 and $195,811.
Like any other element of special damages, future medical cost or expenses must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures more probably than not will be incurred as a result of the injury. Fleming v. Smith, 93-488 (La.App. 5th Cir.5/31/94), 638 So.2d 467. The burden of proof in a claim for future medical expenses is a preponderance of evidence. Fleming, supra; Durkee v. City of Shreveport, 587 So.2d 722, 730 (La.App. 2nd Cir. 1991), writ denied, 590 So.2d 68 (La. 1991). Awards will not be made for future medical expenses which may or may not occur, in the absence of medical *1171 testimony that the expenses for necessary treatment are indicated and setting out their probable cost. Fleming, supra; Durkee, supra.

Mayeaux v. Denny's Inc., 95-453 (La. App. 5th Cir.10/18/95) 663 So.2d 822, 826.
The evidence clearly indicates the necessity of certain items, such as the prostheses and doctor visits, the costs of which are well within the award granted by the trial court. Other items, such as house modifications and possible skin flap surgery, were speculative. In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and are inevitable. Stiles v. K Mart Corp., 597 So.2d 1012, 1013 (La.1992). While in the lower range of possible awards, $250,000 was within the range of calculations presented by the experts and based on the evidence, we cannot say it is so low so as to constitute an abuse of discretion. We affirm the JNOV with regard to the damages granted to Mendoza by the trial court.

SCHNEIDER'S DAMAGES
The damage award to the Schneiders was not the subject of a JNOV and the State has appealed this portion of the jury verdict.
The standard for the review of damage awards is whether, after an articulated analysis of the facts, this court finds that the trial judge abused his great discretion. Bostwick v. M.A.P.P. Industries, Inc., 97-791 (La.App. 5th Cir.12/30/97), 707 So.2d 441, 448; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of the injured plaintiff. Bostwick v. M.A .P.P. Industries, Inc., 707 So.2d at 448; Theriot v. Allstate Ins. Co., 625 So.2d at 1340. After an analysis of the facts and circumstances peculiar to the particular case and plaintiff, an appellate court may conclude that the award is inadequate. Bostwick v. M.A.P.P. Industries, Inc., 707 So.2d at 448; Theriot v. Allstate Ins. Co., 625 So.2d at 1340. Only then is a resort to prior awards appropriate, and then for the purpose of determining the highest or lowest point which is within that discretion. Bostwick v. M.A.P.P. Industries, Inc., 707 So.2d at 448; Theriot v. Allstate Ins. Co., 625 So.2d at 1340.
Lapeyrouse v. Wal-Mart Stores, Inc., 98-547 (La.App. 5th Cir.12/16/98), 725 So.2d 61, 66, writ denied, 99-C-0140, (La.3/12/99), 739 So.2d 209, 1999 WL 172330.
Sean Schneider resided with his parents, although he also had a domicile in Jefferson Parish. In high school, Sean played sports and his parents attended his games. He always did chores around the house. The entire family ate supper together every day and theirs was a harmonious relationship. As he got older, he and his father went fishing, to casinos and to sporting events together. The family took trips together. On the night of the accident, the Schneiders were called to East Jefferson General Hospital. Ultimately, they were told that Sean had died and Mrs. Schneider became extremely upset, requiring hospitalization. Mr. Schneider feels as though he has lost something he can never recover and passes the mausoleum where Sean is buried every morning on the way to work, telling him "hello". The family went to grief therapy for about 15 months. Mrs. Schneider goes to the cemetery every day. This court is obliged to reduce the incalculable to economic terms.
In attempting to fix, in monetary terms, damages to parents for the death of a beloved child, we are acutely aware that no equation exists between the profoundness of the loss and the amount of any judgment. Such bereavement cannot translate into fiscal terms and each child is a pearl beyond price to its own parents. Yet it is our task to attempt, at least, to measure the immeasurable with finite tools and, in cases such as this, the only means at our disposal is money.
*1172 Turner v. Parish of Jefferson Through Dept. of Recreation, 98-336 (La.App. 5th Cir.10/14/98), 721 So.2d 64,78, citing St. Hill v. Tabor, 549 So.2d 870, (La.App. 5th Cir.1989), on rehearing.
Despite the inherent difficulties in determining these awards, we conclude that an award of $1,000,000 to each parent is excessive and constitutes an abuse of discretion. Our review of prior judgments discloses that awards for comparable situations range from $150,000, see: Cradeur v. State Through Dept. of Transp. and Development, 607 So.2d 1050, (La.App. 3rd Cir.1992) to $350,000. Owens v. Concordia Elec. Co-op, Inc., 95-1255 (La.App. 3rd Cir.6/25/97) 699 So.2d 434.[2] Therefore, we reduce the award to the highest point within that discretion, $350,000 each to Edith and Steven Schneider.

EXCLUSION OF MEDICAL RECORD EVIDENCE
Numerous pre-trial motions were filed in this case. At issue is a "Motion In Limine Or Alternatively, To Strike Testimony And Records Concerning Alcohol Consumption". Plaintiffs requested the trial court exclude a Jefferson Parish Coroner's Forensic Laboratory Report on Sean Schneider and Mendoza requested exclusion of a patient history taken by Dr. Thao Dola at East Jefferson General Hospital on the night of the accident. The trial court reserved ruling on admissibility but later ruled at trial to exclude the report. The trial court found that the chain of evidence rendered the laboratory report inadmissible. The trial court found issues as to the time of the actual test and was not satisfied that the blood tested belonged to the victim. The laboratory report stated that the blood specimens were obtained approximately 1 hour and 45 minutes before the autopsy was actually performed, contrary to the coroner's report that the samples were taken during the autopsy itself. Further, the report indicated that the person from whom the blood was taken was 42 years old, while Sean Schneider was only 26. The report was later amended to include the correct age.
The state argues that Dr. Fraser McKenzie, who drew the samples, could have verified the date and time of drawing and that the samples were in fact drawn from Sean Schneider. However, the State did not offer the testimony of Dr. McKenzie for this purpose, who did not testify at trial.
...absent the medical records exception, proponents of a blood alcohol test result are required to lay a proper foundation, which foundation relates not only to the chain of custody, but also to the integrity and reliability of the chemical test.... in Wells v. State Farm Mutual Automobile Insurance Co., 573 So.2d 223, 227 (La.App. 1st Cir.1990), the court stated that "[t]he requirements for the introduction of a blood test analysis are very stringent; the party seeking to introduce such evidence must first lay a proper foundation for its admission." Pearce v. Gunter, 238 So.2d 534 (La. App. 3rd Cir.1970). "This predicate must connect the specimen with its source, show that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis and properly tested." Id. The purpose of the chain of custody rule is to assure the integrity of the evidence.
Judd v. State, Dept. of Transp. and Development, 95-1052, (La.11/27/95), 663 So.2d 690, 694 (some citations omitted).
The trial court's reservations relative to the evidence were well-founded. Generally, a trial court has broad discretion in handling discovery matters. Laburre v. East Jefferson General Hospital, 555 So.2d 1381, 1385 (La.1990); Krepps v. Hindelang, 97-980 (La.App. 5th Cir.4/15/98), 713 So.2d 519. Under the *1173 circumstances of this case, we find no abuse of that discretion.
The trial court considered the patient history taken by Dr. Dola, which stated Mendoza had consumed approximately 8 beers before the accident. The trial court stated that Dr. Dola testified in her deposition that if she had believed Mendoza was intoxicated or smelled alcohol on his breath she would have so noted in that report. She would also have ordered a blood alcohol test. She did not note evidence of intoxication, did not recall smelling alcohol and did not order a blood test. She did note that Mendoza suffered no cognitive defects and admitted plaintiff could have told her he had "a beer" instead of "eight beers". The trial court also noticed that the physician who examined Mendoza before Dr. Dola made no notation regarding possible intoxication. Other than the notation in question, the medical records were void of any evidence of alcohol consumption and there was "voluminous" testimony that Mendoza had not consumed more than 1 or 2 beers. The trial court concluded that considering all the evidence, the notation was "highly suspect" and a "mistake" and that the admission of the "eight beer" notation would unduly prejudice Mendoza. The trial court ordered that the notation be blacked out of the record.
The State argues that La. R.S. 13:3714 provides that hospital records are admissible as prima facie proof of its contents and the trial court should have admitted the material. Citing Judd v. State, supra, the State argues that no foundation beyond certification is required for the admission of such records.
The purpose of R.S. 13:3714 is to provide an exception to the hearsay rule and save a litigant the difficulty and expense of producing as a witness each person who assisted in the treatment of the patient. Judd, supra at p.694. However, the Judd court also stated:
... a trial judge may exclude the records if they are unfairly prejudicial, Id., or as our LA. CODE EVID. art. 403 states "if its probative value is substantially outweighed by the danger of unfair prejudice."

Judd, supra at p.695.
Considering the problems with the record as enumerated by the trial court, we cannot find that the trial court abused its discretion in determining that the probative value of that portion of the notation was outweighed by the danger of unfair prejudice.[3]

DECREE
For the foregoing reasons, we amend the judgment in the Mendoza case as follows:
IT IS ORDERED, ADJUDGED AND DECREED that the portion of the JNOV regarding liability is reversed, and the verdict of the jury finding Mashburn 25% at fault and Mendoza 75% at fault is reinstated.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the portion of the JNOV awarding damages to Mendoza is affirmed.
We amend the judgment in the Schneider case as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that the portion of the JNOV regarding liability is reversed and the verdict of the jury finding Mashburn 25% at fault and Sean Schneider 75% at fault is reinstated.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the jury verdict is hereby amended to reflect that damages for mental anguish, distress, emotional pain, loss of love and affection are granted in the amount of $350,000 each to Steven and Edith Schneider. In all other respects, the jury verdict is affirmed.
*1174 Costs of this appeal are assessed to Mashburn, Mendoza and the Schneiders in equal proportions.
JNOV REVERSED IN PART AND AFFIRMED IN PART; JURY VERDICT AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] The accident reports were not admitted into evidence at the trial.
[2] Also Brown v. Louisiana Indem. Co., 96-1393 (La.App. 3rd Cir.4/23/97), 693 So.2d 270 ($275,000); Hasha v. Calcasieu Parish Police Jury, 94-705, (La.App. 3rd Cir.2/15/95), 651 So.2d 865 ($325,000).
[3] Moreover, with regard to both these records, we note that the State was not prejudiced since the jury found no fault on its part.