GUIDRY, J.
|2A utility company appeals a jury’s award of damages in a wrongful death and survival action, contending that certain evi-dentiary rulings by the trial court interdicted the factual determinations of the jury in this matter.
FACTS AND PROCEDURAL HISTORY
In the early morning hours of September 6, 2013, Aaron Dan Thompson (Dan) sat talking with Jenkins Brent Armstrong (Brent) and Shane Courrege in the Spanish Moon bar in Baton Rouge, Louisiana. Brent had been working as a deejay at the bar that night, and Shane, a part owner of the bar, had stopped by to see if any help was needed closing the bar for the night. The three initially sat talking at the counter in the barroom, but eventually made their way to the roof of the building in which the bar was housed. While the three stood talking on the roof, Dan leaned against the parapet wall enclosing the roof and reached out to grab a wire that was hanging about a foot from the building. Nearly 8,000 volts of electricity flowing through the wire immediately transferred to Dan’s body, causing his right hand to catch a flame and burn off as the electricity coursed through his body to exit out his back. Dan fell down dead as a result of his contact with the wire.
A subsequent investigation of the incident revealed that the wire Dan had grabbed was positioned too close to the building, in violation of the National Electrical Safety Code.
On September 4, 2014, Charles James Thompson, Dan’s father, filed a petition for damages against Entergy Corporation, Entergy Gulf States Louisiana, LLC, En-tergy Louisiana, LLC, David and Desire Crawford,[1] and Shane, individually and doing business as “The Spanish Moon.” Mr. Thompson later ^dismissed the claims against Entergy Corporation, Entergy Louisiana, LLC, and David and Desiree Crawford. Mr. Thompson compromised the claims against Shane individually and doing business as the Spanish Moon and consequently dismissed Shane and the Spanish Moon from the suit as well. Thus, the matter proceeded to a jury trial solely against Entergy Gulf States Louisiana, LLC (“EGSL”).
Prior to the commencement of a three-day jury trial, EGSL stipulated to liability, leaving for the jury’s consideration the issues of allocation of fault and assessment of damages. Following the presentation of evidence, the jury rendered a verdict finding EGSL to be 65 percent at fault and Dan to be 35 percent at fault for the electrocution death. The jury awarded $450,000.00 in survival action damages for the pain and suffering it found Dan to have *1167 experienced upon being electrocuted. As for Mr. Thompson’s wrongful death claim, the jury awarded $450,000.00 for loss of felicity, $450,000.00 for loss of love and affection, and $450,000.00 for loss of society and companionship, for a total wrongful death award of $1,350,000.00. As a final element of damages, the jury awarded funeral expenses in the amount of $6,068 80, Consistent with the jury’s verdict, the trial court signed a judgment on September 8, 2015, in favor of Mr. Thompson against EGSL in the amount of $1,173,944.70, from which EGSL suspensively appeals.
ASSIGNMENTS OF ERROR
On appeal, EGSL asserts the following as errors committed by the trial court relative to the judgment appealed:
A. The [trial] court committed legal error in ruling that [EGSL] owed the plaintiff a duty to admit responsibility for a tort; the court’s admission of prejudicial evidence on this non-existent duty was error and tainted the jury’s award of damages to the plaintiff for the death of his adult son.
B. Solely in the alternative, the [trial] court abused its discretion in awarding the plaintiff $1,350,000 in wrongful-death damages.
|4C. The [trial] court abused its discretion in awarding $450,000 in survival-action general damages.
DISCUSSION
The first issue to be resolved in this appeal is to determine whether it was proper for the trial court to allow the plaintiff to argue and present, evidence of EGSL’s failure to advise Mr. Thompson of its negligence relative to the electrical wire being positioned too close to the Spanish Moon building. At trial, the plaintiff was allowed to present evidence that within a few days following Dan’s electrocution, EGSL learned that the electrical wire Dan grabbed was too close to the building, in violation of the National Electrical Safety Code (NESC), which required the wire to have at least a three-foot clearance from the building.[2] Testimony was solicited from Mr. Thompson regarding whether anyone from EGSL had contacted Mr. Thompson to inform him of the company’s negligence in allowing the electrical wire to be positioned so close to the building. Counsel for Mr. Thompson stated that he was trying to prove a “cover up” and that EGSL was hiding evidence, which counsel argued was an admission or could be considered fault. The trial court overruled EGSL’s objection to the testimony, explaining that the “pleadings set out [a] demand for damages for wrongful conduct causing injury in related damages.”
Although EGSL conceded liability in this matter, its concession does not change the basic principle that in a negligence action, the plaintiff bears the burden of proving fault, causation, and damages, Gaspard v. Safeway Insurance Company, 14-1676, p. 4 (La. App 1st Cir. 6/5/15), 174 So.3d 692, 694, writ denied, 15-1588 (La. 10/23/15), 184 So.3d 18. Moreover, in a civil case, the duty to disclose to one’s adversary arises through specific discovery re *1168 quests. Wright v. Louisiana Power & Light, 06-1181, pp. 17-18 (La. 3/9/07), 951 So.2d 1058, 1070-71. In .this case, in response to a request for admissions propounded to it, EGSL admitted the clearance violation on which its liability is premised. And while we recognize that there may be instances in the law in which a tortfeasor is required to disclose wrongdoing or negligence of which he is , aware, see Bunge Corporation v. GATX Corporation, 557 So.2d 1376, 1383-84 (La. 1990), we have not found, nor has the plaintiff revealed, where such is required under the circumstances presented herein.
In Bunge Corporation, the Louisiana Supreme Court considered whether a contractor’s failure to disclose the existence of a construction defect that it learned of after it had built a grain storage tank for the plaintiff constituted fraud such that the plaintiffs claim against the contractor would not be subject to a statutory per-emptive period. In determining that issue, the court provided the following general discussion regarding the duty to disclose:
[T]he failure to disclose existence of a known danger, where one knows that another is relying on the appearance of safety, can constitute misrepresentation.
“.., The surgeon who remains silent when he discovers that he has left his tools in the patient’s anatomy, the air 'traffic controller who fails to warn a pilot of air turbulence, the landlord who leases defective premises, the landowner who permits a licensee to enter without warning of hidden perils, the seller of a chattel who fails to disclose its hidden dangers, the person who promises and then fails to pass on information important to another’s welfare, each may be liable to the person with whom he deals, or to others whom harm is to be expected through that person’s reliance. The ‘something like fraud on the part >of the giver,’ which the courts have found in these cases, consists in permitting another to rely upon a tacit assurance of safety, when it is known that there is danger.” Prosser, and Keeton, Torts, 207-08 (1984).
| Jt has long been held that the duty to disclose exists where the parties stand in some confidential or, fiduciary relation to one another, such as that of principal and agent or executor and beneficiary of an estate.
Bunge Corporation, 557 So.2d at 1383-84 (footnote marker omitted)(emphasis added). The court further explained:
The confidential relationship is not restricted to any specific association of the parties. While the most frequent illustrations are those of trustee and beneficiary, attorney and client, parent and child, or husband and wife, the term also embraces partners and -co-partners, principal and agent, master and servant, physician and patient, “and generally all persons who are associated by any relation of trust and confidence.”
Bunge Corporation, 557 So.2d at 1384 n.4 (citation omitted).
In the subject case, the evidence presented at trial established that EGSL became aware of the NESC violation after Dan’s electrocution, and it is this after-the-accident-acquired knowledge that Mr. Thompson asserts, and the trial court agreed, "EGSL had a duty to disclose. Yet, Mr. Thompson did not face any danger relative to the wire after the accident occurred nor did he rely on an appearance, of safety[3] nor can it- be said that there exist *1169 ed a confidential relationship between him and EGSL such that a general duty to disclose would exist under the circumstances identified by the Louisiana Supreme Court in Bunge Corporation. Hence, the record and the law reveal that in the only instance in which a duty was imposed on EGSL to admit fault (ie., upon the request for discovery), it complied. Thus, we find that the trial court erred in allowing argument and evidence to be presented to .the jury indicating that ÉGSL wrongly failed to disclose its negligence to Mr, Thompson.
If a trial court commits consequential error by admitting evidence that should have been excluded, the fact finding process is interdicted; thus, the verdict |7is tainted. If the admission or exclusion of evidence tainted a jury verdict, this court steps into the shoes of the factfinder and conducts a de novo review of all of the admissible evidence. Maldonado v. Kiewit Louisiana Co., 12-1868, p. 8 (La. App. 1st Cir. 5/30/14), 152 So.3d 909, 918, writ denied, 14-2246 (La. 1/16/15), 157 So.3d 1129.
Additionally, we find that in this case, the improper examination of witnesses and improper argument by plaintiffs counsel was a direct appeal to passion and- prejudice that tainted the jury’s assessment of damages.[4] Accordingly, in order for the ends of justice to be met, we will review the jury’s survival action and wrongful death damage awards in accord with the proper evidence of record. See Kennedy-Fagan v. Estate of Graves, 07-1062, p. 17 (La. App. 1st Cir. 7/21/08), 993 So.2d 255, 267-68, writ denied, 08-2079 (La. 11/10/08), 996 So.2d 1073; Reese v. Winn-Dixie of Louisiana, Inc., 542 So.2d 68, 73 (La. App. 3d Cir.), writs denied, 546 So.2d 1218, 1222 (La. 1989).
| ^Damages
Although both actions arise from a common tort, survival .and wrongful death actions are separate and distinct. Each right arises at a different time and addresses itself to the recovery of damages for totally different injuries ■ and losses, Taylor v. Giddens, 618 So.2d 834, 840 (La. 1993), The survival action comes into existence simultaneously with the existence of the tort and is transmitted to beneficiaries upon the victim’s death and permits recovery only for the damages suffered by the victim from the time of injury to the mo- *1170 merit of death. It is in the nature of a succession right. McGee v. A C and S, Inc., 05-1036, p. 14 (La. 7/10/06), 933 So.2d 770, 779-80. On the other hand, the wrongful death action does not arise until the victim dies and it compensates the beneficiaries for their own injuries which they suffer from the moment of the victim’s death and thereafter. Wrongful death damages compensate beneficiaries for their own injuries. Taylor, 618 So.2d at 840.
Wrongful Death Award
Louisiana Civil Code article 2315.2(A)(2) provides that when a person dies due to the fault of another, leaving no surviving spouse or children, the parents may bring suit to recover the damages that they sustained as a result of the person’s death. A wrongful death action is intended to compensate the deceased’s loved ones for the losses they sustained as a result of the death. The elements of damage for wrongful death are loss of love, affection, companionship, services, and support, as well as medical and funeral expenses. See Rideau v. State Farm Mutual Automobile Insurance Company, 06-0894, p. 18 (La. App. 1st Cir. 8/29/07), 970 So.2d 564, 580, writ denied, 07-2228 (La. 1/11/08), 972 So.2d 1168.
Following Dan’s death, Mr. Thompson testified that he could not sleep for four days after viewing the pictures of Dan’s body following the electrocution, and | sthat even at the time of trial, he still had trouble sleeping, stating that he was lucky to get two to three hours of sleep a night. He said his doctor gave him a prescription for Ambien to help him sleep, but the medication had not been very successful.[5] He further testified that on Fridays, it is hard for him to get through the day, because Dan died on a Friday, so he just does not like Fridays. Mr. Thompson’s current wife, Ping Thompson, corroborated his testimony and recounted coming home one Friday night after work at around 1 a.m., because she worked the night shift, to find the whole house dark and Mr. Thompson sitting in the back yard. She said Mr. Thompson was crying, and he told her he wanted to die, which scared her so much that she changed her work schedule so that she no longer worked on Fridays.
While it is impossible to place a monetary value on the life of a child, our jurisprudential system has established that a monetary award is the appropriate remedy to one who has suffered the loss of a loved one as a result of the negligence of another. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 833 (La. 1991). Dan was 34 years old when he died. Mr. Thompson testified that he divorced Dan’s mother in 1994, and following the divorce,' Dan initially resided with his mother, but then Dan later moved to Baton Rouge to reside with Mr. Thompson. In 1998, Dan, while still residing in Baton Rouge, moved out of Mr. Thompson’s home to live on his own. Then in 2000, Mr. Thompson moved to Arizona, after which Mr. Thompson testified that the two would see each other roughly once a year and talk on the phone at least once a week. Mr. Thompson acknowledged that for the 15 years prior to the accident (after Dan moved out in 1998), Dan lived on his own and did not financially support Mr. Thompson. Dan was the third oldest of Mr. Thompson’s five sons.
ImDespite the inherent difficulties in determining such an award, on de novo re *1171 view, we conclude that $450,000.00 is an appropriate amount to award Mr: Thompson for the wrongful death of his adult, unmarried son on whom he did not rely for financial support and who maintained a separate domicile in another state.[6]
Survival Action Award
When a person dies due to the fault of another, leaving no surviving spouse or children, the parents acquire the right to recover all damages for the injury to that person that resulted in his death. La. C.C. art. 2315.1(A)(2). Survival damages may be awarded for the pre-death mental and physical pain and suffering of the deceased. In determining survival damages, the court should consider the severity and duration of any pain or any pre-impact fear experienced by the deceased, and any other damages sustained by the deceased up to the moment of death. Maldonado, 12-1868 at p. 37, 152 So.3d at 936. “Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear, or mental anguish during an ordeal leading to the death is compensable.” Leary v. State Farm Mutual Automobile Insurance Company, 07-1184, pp. 3-4 (La. App. 3d Cir. 3/5/08), 978 So.2d 1094, 1098, writ denied, 08-0727 (La. 5/30/08), 983 So.2d 900 (quoting Patrick v. Employers Mutual Casualty Company, 99-94, p. 17 (La. App. 3d Cir. 8/11/99), 745 So.2d 641, 652, writ denied, 99-2661 (La. 11/24/99), 750 So.2d 987).
|1VA jury may award damages for pain and suffering in a survival action where there is the smallest amount of evidence of pain, however brief, on the part of the deceased, based on his actions or otherwise. Etcher v. Neumann, 00-2282, p. 16 (La. App. 1st Cir. 12/28/01), 806 So.2d 826, 840, writ denied, 02-0905 (La. 5/31/02), 817 So.2d 105. The survival action permits recovery only for damages actually suffered by the deceased from the time of injury to the moment of death, including pain and suffering, loss of earnings, and any other damages sustained before death. Where there is no indication that a decedent consciously suffered, an award for pre-death pain and suffering should be denied. Sacco v. Allred, 02-0141, pp. 11-12 (La. App. 1st Cir. 2/19/03), 845 So.2d 528, 538.
The only evidence presented to the jury regarding Dan’s pre-death mental and physical pain and suffering came from the testimony of Brent, Shane and the consulting forensic, engineer, Frederick Brooks. On questioning by plaintiff’s counsel, Brooks testified:
Q. All right, sir. Now, the other question I have, and if you can’t answer this, I understand: Do you know how long it takes from when he makes that contact until when he is rendered unconscious?
*1172 A. That—That’s medical, Mr. Ungles-by. I can’t really—I mean, my experience, it’s quick. It’s not instantaneous. But I don’t—I don’t pretend to be a medical doctor—
Q. ' Uh-huh.
A. —to make [that] analysis.
Q. However long it takes the electricity to move through it?
A. It’s quick. I mean, but! don’t know, you know, I’ve seen, I’ve investigated accidents where people have lost consciousness and consciousness is returned. T mean, it’s a lot of variations. I mean, I think that’s asking for a medical opinion and I really can’t give it.
Likewise, when questioned about electric chair executions, Brooks admitted that while he could testify.about water and its effect on the flow of electricity, he lacked the medical knowledge to discuss the pain experienced by someone being | ^.electrocuted. Brooks did, however, explain that in contacting á live electrical wire with' the palm of your hand, “your involuntary muscles that contract when electricity goes through it, is going to cause you to grasp onto [the wire]. And, typically, in that case, you may not be able to let go.”
As previously discussed, Brent and Shane were with Dan the night he was electrocuted. Brent appeared to have observed the most, and he testified the most extensively about what happened when Dan grabbed the electrical wire, because he was looking directly at Dan when he grabbed the wire, whereas Shane was facing more towards Brent when Dan grabbed the wire. As Brent described:
We were standing there talking and it happened very quickly. I can’t remember what we were talking about honest- ■ ly. But I just remember him reaching out just grabbing the line and it was very quick. It all happened really fast. And after that, he just almost [seized] up and tilted back.
When asked if Dan said anything or made any sound after he grabbed the- power line, Brent said “no,” there was “nothing after that.” He said that even as he observed a flame shooting out of Dan’s hand, there was “no sound at all.” When asked if he saw any signs of consciousness in Dan. or whether Dan moved after he grabbed the power line, Brent said “no” and explained that “[h]e grabbed the power line. He fell back. And that’s all I ever saw. There was nothing after that. .No movement that I saw.” When, further asked if he heard Dan “running” or “making any gurgling sounds,” Brent again said “no.”
Shane testified that he did not see Dan grab the wire, but that when he turned to look at Dan, he saw Dan’s hand clasped around the power line already. Shane said he saw Dan’s hand on fire and that Dan was “very still.” He said that it seemed like a “really long time” arid “[i]t was probably literally like about a minute or so,” until Dan’s “hand kind of melted off and he slumped onto the roof.” On further questioning, Shane stated that, he did not know if it was the coroner or Lathe.fire department, but someone told hirii “that they thought the amount of voltage going through the line, that [Dan] died instantly.”
In Sacco, there were witnesses that testified that immediately following a single-car accident in which the defendant driver left the road and drove the car into a canal, the victim passenger, who had a blood-alcohol level of ;225, was unconscious and not breathing, but started breathing or gargling after CPR was performed on him. There was one account that the victim never regained consciousness, never spoke, nor exhibited any reactions with his eyes and another account that the victim was kind of breathing and gasping, semi-con *1173 scious, and his eyes “kept opening and staying closed for a certain amount of time.” Sacco, 02-0141 at pp. 12-13, 845 So.2d at 538-39. The trial court ultimately determined that the victim “did not consciously suffer as a result of the accident,” and this court determined that finding not to be clearly wrong. Sacco, 02-0141 at p. 13, 845 So.2d at 539.
Based on the record before us, we can discern no basis for finding that Dan consciously suffered. The matter before us offers even less evidence than was offered in Sacco to establish that the victim consciously suffered. None of the. evidence offered by Mr, Thompson established that Dan was conscious, suffered, or even lived for any appreciable time after he grabbed the wire. And while the expert witness, Brooks, testified that in his experience, loss of consciousness is “quick,” but not “instantaneous,” he admitted that his testimony could not be definitive of the issue of Dan’s consciousness because he was not a “medical doctor” and he lacked the medical knowledge to authoritatively state that Dan’s loss of consciousness was not instantaneous.
The horrific nature of the wounds to Dan’s body clearly would cause a conscious person to suffer extreme pain, but if Dan died instantaneously, he could not have felt the physiological harm the electricity was causing to his body. As the |Mevidence offered by Mr. Thompson failed to provide sufficient proof that Dan consciously suffered, we find the record does not support a survival action award, and hence, the award must be vacated.
CONCLUSION
Reviewing this matter de novo based on the prejudicial evidentiary error committed by the trial court, we reduce the jury’s wrongful death award to $450,000.00 and vacate the jury’s survival action award. In so ruling, we east all costs of this appeal to the appellee, Charles Thompson.
VACATED IN PART AND AMENDED IN PART.
Whipple, C.J. dissents in part for reasons assigned.
Pettigrew, J. concurs in parts and dissents in part and assign reasons.
McClendon, J. concurs in part and assign reasons.

, The Crawfords were named defendants as the co-owners of the property and building in which the Spanish Moon operated.

. According to Frederick Brooks, a consulting and forensic engineer who investigated the scene of the electrocution following Dan's death, the “National Electrical Safety Code is an embodiment of rules for the safe construction, installation, and operation of electric utility and communications for utility facilities.” He explained that clearance allows enough air separation between energized conductors in places where people activity may occur to protect people from electric contact aboveground. Brooks was offered as an expert in the fields of the NESC, electric utility operating practices, and electrical safety, but the trial court accepted him as an expert in electrical engineering.

. At trial, Dennis Lytle, the operations and safety manager for EGSL, testified that following the accident, EGSL made sure the scene was secured until the line could be *1169 rebuilt to proper clearance. Furthermore, Mr. Thompson, an electrical engineer, testified that when he went to the Spanish Moon on September 10, 2013, he noticed the electrical wire appeared to be too close to the building.

. Indicative of the deliberate appeal to passion and prejudice are the following questions presented by plaintiff’s counsel in examining Lytle:
Q. Now, we get to Christmas. All right. I’m going to assume, Mr. Lytle, you can imagine, without much effort, what Christmas was like for these people after they had lost their son and their brother; right?
[[Image here]]
Q. Before Christmas, do any of these folks that you’re working with have any meetings and say: hey, let's find the Thompsons and let them know what really happened?
[[Image here]]
Q. Sir—[you] are an employee head of safety, but you’re also a citizen of the United States, and you're a man, and you’re a father; right?
A. Yes.
Q. So, sir, common decency, knowing what you knew, and by that, I don't mean just you, your company knew about the role your knowledge played in that boy’s death; you felt no moral compunction to say: y’all, we got to tell this family so that they don’t go through the rest of their life thinking—
[[Image here]]
Q.—it's all their son's fault?
Notably, in regards to the last question quoted above, the trial court finally sustained EGSL’s objection to such questions, finding that the prejudicial effect of that question outweighed the probative value.

. Mr. Thompson testified that when he took the medication, he would only take half a pill, because he did not want to take a whole pill. He further said, "[i]t would help me fall asleep. An hour later, I'm awake and I can’t go back to sleep unless I take the other half to go back to sleep.”

. In Kennedy-Fagan, this court held "there is one element of damages in wrongful death actions intended to compensate the victims for the loss of love, affection, and companionship, i.e., the emotional loss." Hence, it was determined that "[i]t was legal error for the jury to make three separate awards for this one element of damage.” Kennedy-Fagan, 07-1062 at p. 18, 993 So.2d at 268. In .the present matter, the jury likewise granted Mr. Thompson separate awards for his emotional loss; however, pursuant to our de novo review, we render one single award for the loss. See also Mendoza v. Mashburn, 99-499, pp. 5, 22-23 (La. App. 5th Cir. 11/10/99), 747 So.2d 1159, 1163 and 1172, writs not considered, 00-0040, 000043. (La. 2/18/00), 754 So.2d 957 and writ denied, 00-0037 (La. 2/18/00), 754 So,2d 976 (wherein the jury awarded each parent $500,000.00 for mental anguish and $500,000.00 for loss of love and affection, for a total of $1,000,000.00 each in wrongful death damages, but the appellate court reduced the amount awarded each parent to $350,000.00 total).