STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-720

WAYNE D. LAGRAPPE, ET AL.

VERSUS

PROGRESSIVE SECURITY INSURANCE CO., ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2011-5673
HONORABLE RICHARD WILSON, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

AFFIRMED.

Aaron Broussard
Broussard & Hart
1301 Common Street
Lake Charles, LA 70601
(337) 439-2450
COUNSEL FOR PLAINTIFFS- APPELLEES:
    Wayne D. LaGrappe
    Jean Ann LaGrappe

**Robert C. McCorquodale**
**In-House Counsel**
**Post Office Box 2185**
**Lake Charles, LA 70602**
**(337) 491-3622**
**COUNSEL FOR DEFENDANT-APPELLANT:**
>    **Sheriff Tony Mancuso, in his official capacity as the Sheriff of Calcasieu Parish, Louisiana**

**Todd M. Ammons**
**Stockwell, Sievert,Viccellio, Clements & Shaddock, L.L.P.**
**P. O. Box 2900**
**Lake Charles, LA 70602**
**(337) 436-9491**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
>    **Sheriff Tony Mancuso, in his official capacity as the Sheriff of Calcasieu Parish, Louisiana**
>    **Ace American Insurance Company**

**PICKETT, Judge.**

The defendant sheriff appeals the judgment rendered in favor of the plaintiffs for injuries they sustained when their vehicle was rear-ended on Interstate 210 (I-210) in Lake Charles after a sheriff's deputy blocked both eastbound lanes of I-210 for a funeral procession to merge onto the interstate. For the following reasons, we affirm the judgment.

## FACTS

On December 13, 2010, the Calcasieu Parish Sheriff's Office Funeral Division was escorting a funeral procession from Johnson's Funeral Home in Lake Charles, Louisiana to Dry Creek, Louisiana. The funeral procession left the funeral home and traveled north on Lake Street until it reached College Street/I-210. At College Street, the funeral procession turned east onto College Street then proceeded up the interstate entrance from College Street. A deputy was assigned to control traffic on the interstate as the funeral procession merged onto the interstate.

At the same time, Mr. and Mrs. Wayne LaGrappe were traveling east on I-210 and approaching the Lake Street exit. Mr. LaGrappe was driving. As they approached the exit, Mr. LaGrappe saw a funeral procession turning from Lake Street onto College Street. He then noticed brake lights on vehicles ahead of them beginning to appear. Traffic ahead of the LaGrappes slowed and came to a stop. Mr. LaGrappe also slowed and brought his vehicle to a stop on the crest of the Lake Street overpass. Mr. LaGrappe left space between his vehicle and the vehicles stopped in front of him, so that traffic coming from behind could see him. After coming to a stop, he turned on his flashers. From the top of the overpass, Mr. LaGrappe observed that all traffic ahead of him was stopped. Mr. LaGrappe

also saw that the funeral procession was proceeding up the entrance on to the interstate. After briefly observing the funeral procession, Mr. LaGrappe looked in his rearview mirror and saw a white van approaching from the rear; their vehicle was then was struck from behind.

The white van, a 2003 Ford Econoline van, was owned by Doc's Sight and Sound and operated by Conor English. Mr. English had completed one job for Doc's earlier that morning and was headed to another job when the accident occurred. Mr. English had no recollection of the accident and could not provide any information as to why or how he struck the LaGrappes' vehicle.

The LaGrappes' vehicle was pushed forward into the vehicle in front of them and severely damaged. The right side of their vehicle was pushed inward onto Mrs. LaGrappe, and jaws of life were required to extricate her from the vehicle. Both Mr. and Mrs. LaGrappe suffered injuries in the accident. Fortunately, none of their injuries were life threatening, and with hard work and perseverance, they were able to return to a fairly normal, but modified lifestyle, of what they enjoyed before the accident. Both of the LaGrappes will be affected by their injuries for the rest of their lives.

The LaGrappes filed suit against Mr. English, Doc's Sight and Sound and its insurer, as well as the Calcasieu Parish Sheriff (the Sheriff) and its insurer, ACE American Insurance Company, seeking to recover damages for the above injuries. The claims against English, Doc's Sight and Sound, and their insurer were resolved prior to trial. Beginning January 13, 2014, the LaGrappes' claims against the Sheriff and ACE were tried to a jury. At the trial, ten fact witnesses testified and two traffic reconstruction experts testified, Michael Gillen for the LaGrappes and Michael Sunseri for the Sheriff. After deliberating, the jury assessed 65% fault

2

for the accident to the Sheriff and 35% to Mr. English. The jury awarded Mr. LaGrappe his medical expenses of $25,637.43, and $70,000.00 in general damages, consisting of $50,000.00 for past and future physical pain and suffering; $10,000.00 for past and future loss of enjoyment of life; and $10,000.00 for past and future emotional distress and mental anguish. The jury awarded Mrs. LaGrappe $34,156.52 in medical expenses and $333,000.00 in general damages designated as follows: $200,000.00 for past and future physical pain and suffering; $80,000.00 for past and future loss of enjoyment of life; $45,000.00 for past and future emotional distress and mental anguish; $4,000.00 for disfigurement; and $4,000.00 for permanent disability.

The Sheriff and Ace appealed the judgment.

## ASSIGNMENTS OF ERROR

On appeal, the Sheriff and ACE assign the following seven errors with the trial court proceeding and its judgment.

1. The Trial Court committed legal error in refusing to instruct the jury in accordance with *Petty v. State Farm [Mutual Automotive Insurance Co.*, 06-1069 (La.App. 4 Cir. 2/7/07), 952 So. 2d 767], *Viator v. Gilbert*, 206 So.2d 106 [(La.App. 4 Cir.), *writs refused*, 251 La. 1047, 1048, 208 So.2d 323; *award of damages amended by* 253 La. 81, 216 So.2d 821 (1968)]; *Gandy v. Arrant*, 50 So.2d 676 (La.App. 2[] Cir. 1951); and *Hernandez v. Pan American Fire & Casualty Co.*, 157 So.2d 923 (La. App. 1[] Cir. 1963), warranting *de novo* review.

2. The Trial Court committed legal error in allowing the introduction of [the Sheriff's] Standard Operating Procedures into evidence, when:

   a. the Procedures are directly contrary to statutory law, and;

  b. the Procedures impose a higher duty of care upon the Sheriff than that imposed by law,

  warranting *de novo* review.

3. The Trial Court committed legal error in instructing the jury that the Sheriff's violation of its own procedures could be considered negligence when what was prohibited by those procedures was otherwise allowed by law, warranting *de novo* review.

4. The jury was clearly wrong in assessing any fault to the Calcasieu Parish Sheriff's Office for causing this accident.

5. Alternatively, the jury was clearly wrong in assessing 65% of fault to the Calcasieu Parish Sheriff's Office for causing this accident.

6. The jury abused its discretion in awarding Wayne LaGrappe $70,000.00 in general [damages] sustained in this accident.

7. The jury abused its discretion in awarding Jean LaGrappe $333,000.00 in general [damages] sustained in this accident.

## DISCUSSION

### *The Sheriff's Funeral Procession Standard Operating Procedures*

  The Sheriff argues it was legal error for the trial court to allow the procedures to be introduced into evidence. We cannot overturn a trial court's determination that evidence is admissible unless it constitutes clear error. *Wegener v. Lafayette Ins. Co*., 10-0810 , 10-811 (La. 3/15/11), 60 So.3d 1220.

  Citing various statutes, the Sheriff argues that when not responding to an emergency, his actions and the actions of his deputies must be gauged by an ordinary standard of care. The Sheriff contends, however, that his procedures for funeral processions establish a higher duty of care than the law requires. Therefore, he asserts it was error for the trial court to admit the procedures into evidence and to instruct the jury that it could consider the procedures when considering the issue of its negligence.

4

The Sheriff cites three statutes as establishing the duty of care it owes to the motoring public: La.R.S. 32:24; La.R.S. 32:125; and La.R.S. 14:100.1. Louisiana Revised Statutes 32:24 provides what an emergency vehicle can do when responding to an emergency call, pursuing someone who has or is suspected of violating the law, and responding to a fire. It further specifies that the driver of an emergency vehicle is not relieved of his "duty to drive or ride with due regard for the safety of all persons" and that the provisions do not "protect the driver or rider from the consequences of his reckless disregard for the safety of others." La.R.S. 32:24(D). Section 125 of Title 32 sets forth how motorists should respond to authorized emergency vehicles that are using audible or visual warnings. This provision also states that it "shall not operate to relieve the driver or rider of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons." Lastly, La.R.S. 14:100.1 prohibits the obstruction of any highway by "impeding . . . retarding or restraining traffic . . . thereon," unless such obstruction is created "by governmental authorities, or any officer or agent thereof, in the proper performance of duties."

The Sheriff's procedures provide, in pertinent part:

Escorting a funeral onto an interstate highway is the most dangerous part of escorting, due to the traffic[']s high rate of speed on the interstate. Therefore, the following should occur:

The break vehicle should move traffic over to another lane while the funeral procession enters the interstate. Do not try to stop the traffic while the funeral is getting on the interstate.

This procedure does not establish a higher standard of care than the law does. Rather, it sets forth how Sheriff's deputies directing funeral processions should control or divert traffic in order to maintain due regard for the safety of all

5

persons by obstructing traffic in a manner least likely to disrupt the flow of traffic on the interstate.

Louisiana Revised Statutes 14:100.1 allows the obstruction of traffic by law enforcement when done in the "proper performance of duties," but it does not define "proper performance of duties." "Due regard for the safety of all persons" is the duty established by La.R.S. 32:24 and La.R.S. 32:125; therefore, the "proper performance of duties" contemplated by La.R.S. 14:100.1 must include "due regard for the safety of all persons." Indeed, common sense dictates that the Sheriff's proper performance of his duties includes maintaining due regard for the safety of all persons. As stated above, the Sheriff's procedure sets forth how to maintain due regard for the safety of all persons when obstructing traffic on a highway for a funeral procession. Accordingly, the Sheriff's procedures are not contrary to statutory law and do not impose a higher duty of care upon the Sheriff than that provided by law. Therefore, the trial court did not commit clear error in admitting the procedures into evidence.

The Sheriff cites *Brooks v. City of Jennings*, 06-680 (La.App. 3 Cir. 11/22/06), 944 So.2d 768, and *Jones v. Congemi*, 01-1345, 02-148, 02-149 (La.App. 5 Cir. 5/13/03), 848 So.2d 41, *writ denied*, 03-1647 (La. 10/10/03), 855 So.2d 354, for the proposition that it was error for the trial court to allow the introduction of the CPSO's funeral procession procedures. These cases stand for the proposition that the failure of law enforcement to comply with department policies and procedures may be reasonable under the circumstances of a particular case. The admissibility of each defendant's departmental policies and procedures was not at issue in either of these cases. Therefore, these cases do not support the Sheriff's position.

6

The Sheriff also cites cases from other jurisdictions as support for its claim that its policies and procedures should not have been admitted and put before the jury. The cited cases stand for the proposition that policies and procedures that require a standard higher than ordinary care or the level of care required by law cannot be used to establish negligence on the part of the defendant. They have no application here because we have determined the Sheriff's policies and procedures do not establish a standard higher than ordinary care.

***Jury Instructions***

The Sheriff assigns two errors with the trial court's jury instructions, asserting: (1) the trial court committed legal error in refusing to give an instruction regarding certain rear-end collisions that he requested, and (2) the trial court erred in giving an instruction regarding the Sheriff's procedures for funeral processions that should not have been given.

In *Adams v. Rhodia, Inc.,* 07-2110, p. 7 (La. 5/21/08), 983 So.2d 798, 805, the supreme court determined that when reviewing jury instructions, "the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts." Therefore, the court concluded that "the mere discovery of an error in the judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial *de novo*, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case." *Id.*

The supreme court further explained that even when an erroneous instruction was given to the jury, the instruction must be considered in light of all the instructions "to determine if the charges adequately provide the correct principles

7

of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation." *Id.* at 804. Unless the instructions "misled the jury" and prevented it "from dispensing justice," the jury's verdict should not be set aside. *Id.*

### *Petty v. State Farm Mutual Insurance Co.*

The Sheriff asserts this court should perform a de novo review on appeal because the trial court committed legal error in refusing to instruct the jury in accordance with *Petty*, 952 So.2d 767; *Viator*, 206 So.2d 106; *Gandy*, 50 So.2d 676; and *Hernandez*, 157 So.2d 923. The Sheriff argues that pursuant to these cases, the trial court's refusal to instruct the jury pursuant to the holding in *Petty* constitutes legal error. In *Petty,* 952 So.2d at 769 (emphasis omitted) (quoting *Viator*, 206 So.2d at 109), the court applied the following holding to the facts presented therein:

> When the lead vehicle makes a sudden stop, or one in order to execute an illegal maneuver, but the operator of a second vehicle is able to bring his car to a stop without a collision, the first driver is not liable if a third vehicle collides with the second.

*Petty* occurred on Interstate 10 in Metairie, when a mattress fell off of a vehicle onto the highway. A following vehicle ran into the mattress which caused her to stop in the highway. Two vehicles following the vehicle that hit the mattress were able to stop without colliding with the first vehicle or each other. The fourth vehicle failed to stop and rear-ended the third vehicle that then rear-ended the second driver. Unlike this case, the party whose mattress caused the first driver to stop and contributed to the resulting accidents was not known and was not a party to the litigation. Therefore, *Petty* does not stand for the proposition that the person who created the hazard that lead to the accident was not at fault. Rather, it stands

8

for the proposition that the second driver, who was faced with a sudden emergency, was not at fault.

The Sheriff's argument fails to acknowledge that there are a number of other significant differences between this case and *Petty*. For example, the *Viator* case, which is the basis of the holding in *Petty*, was decided before the enactment of the Comparative Fault Law in 1979, and the requirement of La.Civ.Code art. 2323(A) that in cases seeking reparation for personal injury, "the . . . fault of all persons causing or contributing to the injury, death, or loss shall be determined." Additionally, *Petty* did not mention Article 2323 or discuss why it did not apply to the facts therein. Moreover, there was no discussion of cause-in-fact in *Petty*.

In this case, the Sheriff's deputy's blocking of I-210 was undoubtedly a cause-in-fact of Mr. English hitting the LaGrappe vehicle. If the interstate had not been blocked and the traffic had not backed up, the LaGrappe vehicle would not have been stopped on the interstate, and Mr. English would not have hit it.

The facts of this case are similar to *Mendoza v. Mashburn*, 99-499, 99-500 (La.App. 5 Cir. 11/10/99), 747 So.2d 1159, *writ denied*, 00-37 (La. 2/18/00), 754 So.2d 976. In *Mendoza*, a driver had a one-car accident on the downslope of an overpass on Interstate 10; his vehicle was then hit by another vehicle. The state police responded to the accident and blocked traffic with a cruiser. The plaintiffs, who were speeding on their motorcycles, crashed into other vehicles stopped behind the police cruiser. The jury found the driver of the first vehicle to be 25% at fault and the plaintiffs to be 75% at fault. The trial court granted judgment notwithstanding the verdict, finding the plaintiffs to be 50% at fault and the state 50% at fault; it found no fault on the part of the first driver. On appeal, the fifth

circuit reversed the judgment notwithstanding the verdict and reinstated the jury's verdict, explaining:

> [The driver of the first vehicle] was negligent and his negligence set the entire chain of subsequent events into motion. An initial tortfeaser will not be relieved of the consequences of his negligence unless the intervening cause superceded the original negligence and alone produced the injury. If the original tortfeasor could or should reasonably foresee the accident that might occur, he would be liable notwithstanding the intervening cause. *It was entirely foreseeable that losing control of a vehicle, crashing into a guardrail at the foot of an overpass and obstructing traffic on an interstate highway would result in accidents by following, even speeding, vehicles.*

*Id*. at 1168 (citations omitted) (emphasis added). The *Mendoza* court further concluded:

> Obviously, the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which he has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. . . .

*Id.* (quoting *Miller v. La. Gas Serv. Co*. 601 So.2d 700, 705 (La.App. 5 Cir), *writs denied*, 604 So.2d 999, 1001). In concluding, the court noted that "[t]he motorcyclists' injuries would not have occurred but for the initial accident caused by defendant Mashburn." *Id*. at 1169. The court ultimately determined that the jury's original assessment of fault was correct and reversed the judgment notwithstanding the verdict.

As explained in *Mendoza*, it was foreseeable that the Sheriff's act of obstructing both lanes of traffic on I-210 and causing traffic to come to a stop on a high speed interstate could result in accidents by vehicles approaching the stopped traffic. Blocking the interstate included the risk that vehicles stopped because the interstate was blocked might be hit by drivers who were driving at high speeds.

10

Therefore, the LaGrappes' injuries would not have occurred but for the Sheriff's deputy blocking traffic on I-210.

The trial court's jury instructions included an instruction that conforms with the holding in *Mendoza* and is the current applicable law as per *Adams*, 983 So.2d 798, and *Johnson v. Morehouse General Hospital*, 10-387, 10-488 (La. 5/10/11), 63 So.3d 87. For these reasons, we find no error in the trial court's refusal to instruct the jury as requested by the Sheriff.

### *Violation of the Sheriff's Procedures as Evidence of Negligence*

The Sheriff contends that the trial court's inclusion of the following instruction in the instructions it provided to the jury constitutes error:

> Proof that an organization has violated its own safety rules and training can be used to establish negligence. When an organization violates its own safety procedures designed to prevent the very danger at issue, you may consider that violation as evidence of negligence by virtue of acknowledging the hazard in their own safety policy.

The Sheriff did not object to the complained-of jury instruction, and generally, failure to contemporaneously object to a jury instruction results in waiver of the objections. La.Code Civ.P. art 1793(C). *See also Guidry v. Dwight Manuel, Inc.*, 04-2031 (La. 11/17/04), 887 So.2d 456. The Sheriff argues, however, that the jury instruction contains a "plain and fundamental" error; therefore, our review of his complaint is not prohibited. *Wegener*, 60 So.3d 1220.

We have concluded the Sheriff's procedures do not require that the Sheriff adhere to a standard of conduct higher than that imposed by law. Therefore, the trial court's instruction that allows, but does not mandate, consideration of the procedures as evidence of negligence does not impose a higher standard of conduct on the Sheriff. Accordingly, we also conclude that the instruction does not contain

11

a plain and fundamental error that excuses the Sheriff's failure to contemporaneously object to the instruction.

### *Assessment of Fault to the Sheriff*

In his next two assignments of error, the Sheriff argues the jury was clearly wrong in assessing any fault to him for causing the accident or, alternatively, in assessing 65% fault to him.

A jury's allocation of fault is a fact determination subject to review under the manifest error-clearly wrong standard of review. *Rando v. Anco Insulations, Inc.*, 08-1163, 08-1169 (La. 5/22/09), 16 So.3d 1065. This standard "precludes the setting aside of a [jury's] finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *Id*. at 1087.

Close review of the record establishes that the jury's assessment of fault is not clearly wrong. The Sheriff has a special Funeral Division that escorts funerals throughout the parish. On most occasions, funeral processions are escorted by deputies with prior experience in the Funeral Division. The written procedure and the testimony of deputies experienced in escorting funeral processions established that the merger of the funeral procession onto I-210 was not handled in accordance with the written and unwritten procedures of the Funeral Division.

Pull cars and brake cars are used to escort funeral processions. Pull cars lead the funeral, and brake cars manage traffic along the route to the graveyard to allow the procession to stay together. There is usually more than one brake car to allow for blocking intersections and merging traffic onto the interstate when necessary. Deputies testified that the procedure followed by the Funeral Division is not fully set forth in the written procedure quoted above. The procedure followed by the deputies who testified at trial is that the brake car assigned to merge traffic onto the

12

interstate should park partially on the shoulder and partially in the right lane with his overhead light on to notify traffic to merge left. The brake car should interrupt the flow of traffic for the shortest time possible, and if traffic begins to back up, the deputy in the brake car should instruct the traffic to keep moving by waving his arms or getting out of his vehicle and directing the traffic.

The deputy who blocked the traffic on I-210 was never identified. There is no evidence as to whether he had participated in a funeral procession before or had any knowledge of how to escort a funeral procession. The deputy blocked traffic in both lanes of the interstate, and there is no evidence that he moved or attempted to move his vehicle from blocking both lanes of the interstate until the funeral procession had completely merged onto the interstate and the accident had occurred.

The Sheriff argues that the evidence does not establish that the deputy assigned to control traffic on I-210 as the funeral procession merged onto the highway blocked both of the east-bound travel lanes. He argues, instead, that motorists on the interstate stopped as a courtesy to the deputy as he prepared to merge the funeral procession onto the interstate. Although one witness, Veronica Thibodeaux, testified by deposition that she initially stopped for the deputy as a courtesy, the evidence established that the deputy subsequently blocked both lanes of I-210 with his vehicle. Brian LaLande was in the vehicle in front of the LaGrappes. He testified that the deputy parked his car "cattycorner on an angle to block both lanes." Mr. LaGrappe also testified that the deputy's vehicle blocked both lanes of travel.

The only witness to testify otherwise was Paul Berzas. Mr. Berzas testified the deputy did not block both lanes of travel until the funeral procession was

13

almost completely on the interstate, and he was preparing to leave. On cross-examination, Mr. Berzas's trial testimony was shown to conflict with written and oral statements that he gave immediately after the accident. Accordingly, although Ms. Thibodeaux may have initially stopped as a courtesy to the deputy, it was reasonable for the jury to conclude that the deputy blocked both lanes of travel with his car.

There was conflicting evidence as to what Mr. English would have seen as he approached the overpass. Mr. LaLande testified that he saw brake lights as he approached the overpass and had time to stop his vehicle on the top of the overpass. He opined that Mr. English should have seen the brake lights of the vehicles ahead of him as he approached the overpass and stopped his vehicle safely without causing the accident. Mr. Berzas also testified that he changed lanes as he approached the overpass because he saw the white van driven by Mr. English, approaching from behind him at a high rate of speed. He testified that he was descending the overpass when the accident occurred.

Mr. LaGrappe testified that as he approached the Lake Street exit, there was traffic ahead of him and that some of the traffic exited at Lake Street, while other traffic continued over the overpass. He further testified that he could see brake lights coming on, and he started slowing down. He stopped when he got to the top of the overpass and watched the funeral procession a short time. He then looked in his rearview mirror and was rear-ended. Mr. LaGrappe testified that the cars in front of him, including Mr. Lalande's, were "down-kind of over the crest" of the overpass and that all of the traffic was stopped.

Both traffic reconstruction experts opined that it was neither necessary nor advisable for the deputy to block both lanes of travel on I-210. They further

14

agreed that: (1) the escort of a funeral procession should not create unnecessary hazards; (2) having traffic come to a complete stop on an interstate should be avoided; (3) law enforcement should know that rear-end collisions are a risk of stopping traffic on an interstate; (4) risks increase anytime something out of the ordinary occurs; and (5) the distance travelled on an interstate before a driver perceives and reacts is greater than when traveling at lower speeds.

Mr. Gillen testified that it was "incredibly dangerous" to block interstate traffic, especially on either side of an overpass without proper notice to approaching motorists because it violates their expectation of a free, open, clear roadway. Mr. Gillen also explained in detail how the blocking the interstate can negatively impact a motorist's ability to recognize that the traffic ahead of him has slowed and/or stopped and increase the time required for a motorist to process that information and react to it.

Mr. Gillen opined that although Mr. Lalande and Mr. Berzas testified to seeing lights on vehicles as they approached the overpass, it was unlikely that Mr. English saw what they saw. He believed that Mr. English only saw the rear of the LaGrappes' vehicle and the lights on their vehicle. He cited the time lapse between Mr. Lalande and Mr. Berzas approaching the overpass and Mr. English approaching the overpass to support this opinion. He observed that Mr. Lalande was in front of the LaGrappes and that Mr. Berzas was beyond the crest of the overpass when the accident occurred and saw the accident in his rearview mirror. Based on this evidence, Mr. Gillen concluded that there was no evidence of other vehicles between Mr. English and the LaGrappes and that it was likely Mr. English saw only the lights on the LaGrappes' vehicle as he approached the overpass. In his opinion, Mr. English did not have sufficient clues and notice of both lanes of

15

traffic being completely stopped on the interstate to react timely and avoid the accident.

Mr. Sunseri testified that Mr. English had a clear view of the Lake Street overpass for more than 2700 feet. Mr. Sunseri agreed with Mr. Lalande's opinion that there was no reason, other than his not paying attention, that Mr. English did not see the LaGrappes' vehicle and stop. He opined that if no vehicle was between Mr. English and the LaGrappes, Mr. English should have seen the LaGrappes' emergency flashers for at least fifteen seconds, which was sufficient notice for him to stop. Therefore, he disagreed with Mr. Gillen's conclusion that Mr. English did not have sufficient visual cues and notice alerting him to slow and stop his vehicle before hitting Mr. LaGrappe. On cross-examination, Mr. Sunseri admitted, however, that there was no way to determine how far back Mr. English was when Mr. LaGrappe applied his brakes. He explained that he assumed Mr. English was following at a safe distance and had plenty of time to see the taillights ahead of him, so he could start slowing his vehicle and not hit the LaGrappes.

The factual and expert testimony provided a reasonable basis for the jury to conclude that the Sheriff's deputy was negligent in blocking both lanes of I-210, and his negligence set into motion the chain of subsequent events that led to the LaGrappes being injured in a rear-end collision. As the expert testimony established, it was entirely foreseeable that blocking both lanes of traffic on I-210 might "result in accidents by following, even speeding, vehicles." *Mendoza*, 747 So.2d at 1168. Accordingly, we find no error in the jury assessing fault to the Sheriff.

Now, we consider whether the percentage of fault the jury assessed to the Sheriff was manifestly erroneous. The assessment of fault is guided by the factors

16

set forth in *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967 (La.1985). In *Watson*, the supreme court determined various factors influence the percentage of fault assigned to the parties. Those factors include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. *Id.*

The evidence established that escorting a funeral procession is a courtesy the Sheriff provides to the public. It is not a duty required by law, and no emergency required that the interstate be blocked to accommodate the funeral procession. Under the facts presented here, the Sheriff's deputy was in a superior position to that of Mr. English, and there were no extenuating circumstances that required the deputy to proceed in haste as the funeral procession merged onto the interstate. Moreover, the Sheriff was in a superior position to ensure that all deputies had knowledge of and some training of the procedures to be followed when escorting a funeral procession. However, no evidence indicates the deputy assigned to merge the funeral procession onto the interstate had training or knowledge of the procedures or how to merge traffic onto the interstate with "due regard for the safety of all persons."

As to Mr. English, although his conduct could have resulted in part from inattention, he could not have had a full awareness of the situation on the downside of the overpass where the traffic was stopped. Mr. Gillen's testimony was that Mr. English did not have adequate notice of the traffic being stopped on the other side of the overpass to allow him to safely stop before the accident. The Sheriff

argues, but the evidence does not establish, that Mr. English was speeding before the accident or that he was not paying attention. Compared to the deputy, Mr. English was clearly in an inferior position to recognize the dangers of his actions under the circumstances.

The Sheriff's deputy created the hazard that led to the accident and was in a superior position to appreciate the dangerous risk of blocking the interstate as he did. Moreover, the evidence provided a reasonable basis for the jury to conclude that Mr. English's failure to appreciate the danger of and react to the traffic stopped ahead of him resulted primarily from the risk created by the Sheriff's deputy. For these reasons, we find no error with the jury's assessment of 65% fault to the Sheriff.

## *Damages*

The jury's determination of the amount to award in damages is a finding of fact. *Rando*, 16 So.3d 1065. On appellate review, the initial inquiry regarding an award of damages is whether the award for the particular injuries and their effects upon the particular injured person is a clear abuse of the trier of fact's great discretion. *Id.* Only if a detailed analysis of the facts shows the award to be an abuse of discretion can the award be considered either excessive or insufficient. *Id.* On appeal, we review the jury's exercise of discretion, not decide the damage award we believe would be appropriate. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

The Sheriff complains that the jury's award of $70,000.00 in general damages constitutes an abuse of discretion. The jury awarded Mr. LaGrappe:

18

Past and Future physical pain and suffering:          $50,000.00

Past and Future loss of enjoyment of life:           $10,000.00

Past and Future emotional distress and mental anguish:  $10,000.00

Mr. LaGrappe had not been retired long when the accident occurred and was very active in his retirement. He suffered bruising on the right side of his face and temporal lobe, severe headache, a hematoma on the back of his head, swelling and bruising in his right eye and right hand, numbness in both legs, back pain, and neck pain. As a result of the accident, most, if not all, of the activities he looked forward to before retirement and enjoyed after his retirement were limited by pain he suffered due to a back injury he sustained in the accident and the aggravation of numbness in his thigh and leg associated with his treatment for prostate cancer.

Mr. LaGrappe was unable to address his injuries immediately after the accident because he tended to Mrs. LaGrappe who sustained bilateral broken shoulders. Mrs. LaGrappe's injuries required that Mr. LaGrappe tend to her needs before his because she was unable to use her hands and arms to care for herself. After the accident, he suffered back pain that affected all of his favorite activities, like yard work, gardening, fishing, woodworking, and most importantly, playing with his grandchildren. He described how often he engaged in those activities before the accident and how they were limited after the accident. He explained that while he did not allow the back pain to completely stop his enjoyment of those activities, it did limit how much activity he could engage in and his enjoyment of those activities.

Mr. LaGrappe explained that after being treated for a while for his complaints, his doctor instructed him not to return for further treatment, unless he could no longer tolerate the pain. Mr. LaGrappe's doctor prescribed physical

19

therapy to address his complaints of pain. After achieving maximum benefit from physical therapy, Mr. LaGrappe testified that he stretched daily and used a TENS unit when needed, as recommended by his physical therapist, to manage his back pain. Following this regimen allowed him to continue enjoying his favorite activities, albeit in a more limited capacity.

Mr. LaGrappe also explained that treatment he had previously undergone for prostate cancer had caused some numbness in his thigh. He testified that the numbness was aggravated in intensity and duration by the accident. He also testified that he now experiences pins and needles pain and leg cramps daily in his thigh which he did not before the accident.

Although some may consider the jury's award of $70,000.00 to be generous or even high, we cannot say it is a clear abuse of the jury's discretion "for the particular injuries and their effects under the particular circumstances on the particular injured person." *Id*. at 1260. Considering Mr. LaGrappe's relatively young age of sixty-one years of age at the time of the accident, the manner in which he engaged in and enjoyed numerous activities before the accident, his life expectancy of approximately eighteen years at the time of trial, and the daily impact of his injuries on his activities and his enjoyment of life, we cannot say the jury abused its vast discretion in awarding him $50,000.00 for pain and suffering and $10,000.00 for loss of enjoyment of life.

With regard to Mr. LaGrappe's award of $10,000.00 in past and future emotional distress and mental anguish, we observe that a plaintiff may recover damages for mental anguish sustained while a traumatic ordeal is in progress by showing "that he was involved in a hazardous situation, *within the zone of danger*, and that his fear was reasonable given the circumstances." *Boyd v. Allied Signal,*

*Inc.* 07-1409, p. 17 (La.App. 1 Cir. 10/17/08), 997 So.2d 111, 122, *writ denied*, 08-2682 La. 1/16/09), 998 So.2d 105.

Mr. LaGrappe described the events leading up the accident, the accident itself, and what occurred after the accident. He and his wife were both injured; she was rendered unconscious for a period of time. He tried to calm her fears as they waited to be removed from their vehicle. He then witnessed and tried to ease her fears and potential for additional injury as she was extricated from their vehicle with the "jaws of life." Because he had a potential head injury, Mr. LaGrappe's head was stabilized with duct tape. The duct tape was placed across his chin over his beard. When the duct tape was pulled off, that portion of his beard under the tape went with the tape. Later that same day, he had to travel alone in an ambulance to Lafayette for neurological testing and assessment to determine whether he suffered a neurological injury in the accident. Under these circumstances, we cannot say the jury's award of $10,000.00 for emotional distress and mental anguish constitutes manifest error.

The Sheriff also contends the jury's award of $333,000.00 in general damages to Mrs. LaGrappe was abusive. The jury awarded Mrs. LaGrappe the following general damages:

| | |
|---|---|
| Past and Future physical pain and suffering: | $200.000.00 |
| Past and Future loss of enjoyment of life: | $ 80,000.00 |
| Past and Future emotional distress and mental anguish | $ 45,000.00 |
| Disfigurement | $ 4,000.00 |
| Permanent disability | $ 4,000.00 |

As with Mr. LaGrappe, Mrs. LaGrappe had not been retired long when the accident occurred, and it had a severe impact on her. Both of her shoulders were

21

broken in the accident which necessitated that both of her arms be in slings. Her arms had to be immobilized in slings, and she could not use either of them for three months. She needed assistance with essentially every activity that required the use of one or both of her arms, e.g. turning the page in a book, rising from a chair, eating, and all personal hygiene. Additionally, she developed capsulitis in both shoulders that resulted in her shoulders being "frozen" and immovable. The condition required that her shoulders be manually manipulated by her orthopedic surgeon to release the adhesion that had developed to free them to move. Mrs. LaGrappe explained that although the procedure was performed under anesthesia, the manipulation caused her to suffer great pain for a number of days following the procedure.

Mrs. LaGrappe attended approximately seventy-nine physical therapy sessions. She explained that during physical therapy she often endured pain when the therapist physically moved her arms into positions that she could not move them into on her own to restore their free, natural movement to pre-accident status. She also described her daily routine of at-home physical therapy and how it also caused her pain. She performed her at-home physical therapy three times every day that she did not go to physical therapy and two times every day that she went to physical therapy.

During her convalescence, Mrs. LaGrappe was unable to participate in any of her pre-accident activities, such as, teaching Sunday school, tutoring at a local school, and, most importantly, playing with her grandchildren. She could not even read her Bible without assistance. One of the activities she missed most was being able to pick up and hold her youngest grandchild, who was only two years of age when the accident occurred.

22

Mrs. LaGrappe worked hard and diligently at her physical therapy; however, she was unable to regain full use of her right arm. As a result, her activities continue to be limited due the injuries she sustained in the accident. Her right shoulder now droops. Because she is right handed, Mrs. LaGrappe has to adjust how she does many activities that came naturally before the accident, like reaching for or picking up items she frequently uses in her kitchen. She moved many items stored in her kitchen cabinets to lower shelves to accommodate her limitations. Mrs. LaGrappe explained that although her right arm limits her ability to do some things, she finds a way to perform tasks or activities that she wants to perform. For example, opening a heavy door now requires that she initially open the door with her hand or arm, but she must complete opening the door by using her foot and leg due to the limited strength in her arm. She also described the difficulties she now has with household chores, like moving wet laundry from her washer to her dryer and folding clothes, due to the restricted use of her right arm.

The jury heard Mrs. LaGrappe detail the pain she suffered as a result of her injuries and recovery and the lifelong limitations she must now endure as a result of those injuries. The jury determined the genuineness of her testimony about her injuries, her suffering, the limitations they have caused, and how they affect her. Based on her testimony, the jury judged how her injuries are likely to affect her in the future. In light of Mrs. LaGrappe's age of sixty-one years when the accident occurred, her life expectancy of approximately twenty years, her pre-accident abilities and activities, and the restrictions and limitations caused by her injuries, we cannot say the jury abused its vast discretion in awarding Mrs. LaGrappe $280,000.00 in past and future pain and suffering and past and present loss of enjoyment of life.

The evidence showed that during the aftermath of the accident Mrs. LaGrappe was very disoriented and upset. She cried and was concerned about Mr. LaGrappe. She thought one of their grandchildren was in the vehicle when the accident occurred, and her daughter had to tell her over and over, that the child was not with them, to console her fears. The extent of the emotional distress and mental anguish the accident caused Mrs. LaGrappe is evidenced by the fact that she will no longer drive on I-210, regardless of the inconvenience that causes her when traveling from her home in Sulphur to wherever her destination maybe. For these reasons, we find no abuse of discretion in the jury's award of $45,000.00 for past and present emotional distress and mental anguish.

Mrs. LaGrappe suffered an eight centimeter laceration on her scalp that required twelve staples. Mr. LaGrappe testified that Mrs. LaGrappe was very concerned about the laceration and how it affected styling her hair. He also explained that since he styled her hair until she regained the use of her arms, he had a hard time trying to style her hair to hide the laceration in a way that pleased her. For these reasons, we find no abuse of discretion in the jury's award of $4,000.00 for disfigurement. Nor do we find the jury's award of $4,000.00 for permanent disability to be an abuse of discretion. Mrs. LaGrappe's right collar bone did not heal properly, and her shoulder now droops which has resulted in decreased strength and range of motion in that shoulder.

## DISPOSITON

For the reasons discussed herein, the judgment in favor of Wayne and Jean LaGrappe against Sheriff Tony Mancuso, in his official capacity as the Sheriff of Calcasieu Parish, Louisiana, and ACE American Insurance Company is affirmed.

Costs of $36,247.21 are assessed to Sheriff Mancuso and ACE American Insurance Company.

**AFFIRMED.**